891 So.2d 907 (2003)
Keith Edmund GAVIN
v.
STATE of Alabama.
CR-99-1127.
Court of Criminal Appeals of Alabama.
September 26, 2003.
Rehearing Denied November 14, 2003.
*926 Stephen P. Bussman, Fort Payne; and Steven G. Noles, Fort Payne, for appellant.
William H. Pryor, Jr., atty. gen., and Tracy Daniel and Andy Scott Poole, asst. attys. gen., for appellee.
SHAW, Judge.
The appellant, Keith Edmund Gavin, was convicted of two counts of capital murder in connection with the murder of William Clinton Clayton, Jr. The murder was made capital (1) because it was committed during the course of a robbery in the first degree, see  13A-5-40(a)(2), Ala.Code 1975, and (2) because Gavin had been convicted of another murder within 20 years of the present murder, see  13A-5-40(a)(13), Ala.Code 1975. Gavin was also convicted of one count of attempted murder for shooting at a law-enforcement officer. The jury recommended, by a vote of 10-2, that Gavin be sentenced to death for *927 his capital-murder convictions. The trial court accepted the jury's recommendation and sentenced Gavin to death. In addition, the trial court sentenced Gavin, as a habitual felony offender, to life imprisonment for the attempted-murder conviction.
The evidence adduced at trial indicated the following. A little after 6:30 p.m. on March 6, 1998, Clayton, a contract courier for Corporate Express Delivery Systems, Inc., was shot and killed while sitting in a Corporate Express van outside the Regions Bank in downtown Centre. Clayton had finished his deliveries for the day and had stopped at Regions Bank to obtain money from the ATM in order to take his wife to dinner.
There were four eyewitnesses to the crime, two of whom positively identified Gavin as the shooter. Ronald Baker and Richard Henry, Jr., testified that they were stopped at a traffic light near the Regions Bank and the courthouse in downtown Centre at the time of the shooting. According to Baker and Henry, they saw a man get out of a vehicle, walk to a van parked on the street, and shoot the driver of the van. Upon hearing the gunshots, Baker and Henry immediately fled the scene; neither could identify the shooter.
Larry Twilley testified that he, too, was stopped at a traffic light by the Regions Bank in downtown Centre at the time of the shooting. Twilley testified that while he was stopped at the light, he heard a loud noise, turned, and saw a man with a gun open the driver's side door of a van parked on the street and shoot the driver of the van two times. According to Twilley, the shooter then pushed the driver to the passenger's side, got in the driver's seat, and drove away. Twilley testified that when he first saw the shooter, he noticed something black and red around his head, but that after the shooter got in the van and drove away, the shooter no longer had anything on his head; at that point, Twilley said, he noticed that the shooter had very little hair. At trial, Twilley positively identified Gavin as the shooter.
Dewayne Meeks, Gavin's cousin and an employee of the Illinois Department of Corrections, testified that in early February 1998, he and Gavin traveled from Chicago, Illinois, where they were living, to Cherokee County, Alabama "[t]o pick up some girls ... and just to really get away." (R. 651.) Meeks said that they stayed for a weekend and then returned to Chicago. In early March 1998, Meeks said, Gavin wanted to return to Alabama to find a woman he had met in February. Meeks testified that Gavin told him that if he drove Gavin to Chattanooga, Tennessee, to meet the woman, the woman would reimburse him for the travel expenses. Meeks said that he agreed to drive Gavin to Tennessee and that Meeks's wife and three-year-old son also accompanied them.
Meeks testified that they left Chicago on the night of March 5, 1998, arrived in Chattanooga on the morning of March 6, 1998, and checked into a Super 8 Motel. Meeks said that he rented two rooms at the motel, one for him and his family, and one for Gavin. After they arrived, Meeks said, Gavin made a telephone call, and he and Gavin then drove to a nearby gasoline service station to wait for the woman Gavin had come to see. According to Meeks, the woman did not show up and Gavin then asked him to drive to Fort Payne, Alabama, so that Gavin could find the woman. Meeks agreed and they drove to Fort Payne, but they were again unsuccessful at locating the woman. After they failed to locate the woman in Fort Payne, Meeks said, they drove to Centre to find the woman.
Meeks testified that at approximately 6:30 p.m. on March 6, 1998, he and Gavin *928 arrived in downtown Centre. When they stopped at the intersection near the courthouse and the Regions Bank, Meeks said, Gavin got out of Meeks's vehicle and approached a van that was parked nearby. According to Meeks, he thought Gavin was going to ask the driver of the van for directions. However, when Meeks looked up, he saw that the driver's side door of the van was open, and Gavin was holding a gun. Meeks stated that he watched as Gavin fired two shots at the driver of the van. According to Meeks, immediately after seeing Gavin shoot the driver of the van, he fled the scene, and Gavin got in the van and followed him. Meeks testified that Gavin honked the horn of the van and flashed the lights in an attempt to get Meeks to stop. However, Meeks refused to stop because, he said, he was scared. Meeks stated that he drove back to Chattanooga and told his wife what had happened. He and his wife and child then checked out of the motel and drove back to Chicago.
Meeks testified that when he arrived in Chicago, he immediately informed several of his friends who were in law-enforcement about the shooting. As a result of his conversations with friends, Meeks said, he realized the gun used by Gavin was probably the gun that had been issued to him by the Illinois Department of Corrections. Meeks said that he then checked his home and determined that his gun was, in fact, missing. According to Meeks, he kept the gun in a drawer at home and he had not seen the gun for approximately two weeks before the shooting. Meeks testified that he immediately reported the gun as missing to law enforcement. Meeks admitted that he did not mention to law enforcement when he reported the missing gun that he believed the gun had been used in a shooting in Alabama, but he said that he did inform his boss at the Illinois Department of Corrections that he believed the gun had been used in the shooting. After reporting the gun missing and discussing the shooting with several friends, Meeks said, he then contacted Alabama law enforcement to inform them of his knowledge of the shooting. On March 9, 1998, and again on April 6, 1998, Meeks was interviewed in Chicago by investigators from Alabama. After the interviews, Meeks said, he was indicted for capital murder in connection with the murder of Clayton; that charge was subsequently dismissed.
Danny Smith, an investigator with the District Attorney's Office for the Ninth Judicial Circuit, testified that on the evening of March 6, 1998, he was returning to Centre from Fort Payne when he heard over the radio that there had been a shooting and that both the shooter and the victim were traveling in a white van with lettering on the outside. As he proceeded toward Centre, Investigator Smith said, he saw a van matching the description given out over the radio, and he followed it. According to Investigator Smith, the van was traveling approximately 75 miles per hour and the driver was driving erratically. Investigator Smith testified that he was speaking on the radio with various law-enforcement personnel regarding stopping the van when the van turned on its blinker and stopped on the side of the road. When he pulled in behind the van, Investigator Smith said, the van abruptly pulled back onto the road and sped away. Investigator Smith said that he continued pursuing the van and that, after he turned on his emergency lights, the van stopped in the middle of the road, near the intersection of Highways 68 and 48. Investigator Smith testified that when the van stopped, the driver got out of the vehicle, turned, fired a shot at him, ran in front of the van, turned and fired another shot at him, and then ran into nearby woods. Investigator Smith testified that the driver of the van *929 was black, and that he was wearing a maroon or wine-colored shirt, blue jeans, and some type of toboggan or other type of cap. At trial, Investigator Smith positively identified Gavin as the person who had gotten out of the van and shot at him.
After Gavin fled into the woods, Investigator Smith said, he went to the van and checked the victim. According to Investigator Smith, the victim was still alive, but barely, and he radioed for an ambulance. Investigator Smith testified that when he first went to the van, he saw blood between the two front bucket seats and on the passenger seat; however, there was "very little blood" on the driver's seat. (R. 567.) Investigator Smith said that when emergency personnel removed the victim from the van, blood was transferred to the driver's seat by the personnel who had to enter the van to secure the victim and remove him.
Investigator Smith also testified that, within minutes of Gavin's fleeing into the woods, several law-enforcement officers arrived at the intersection of Highways 48 and 68, and the wooded area into which Gavin had fled was encircled and sealed off so that "no one could come out and cross the road without being seen." (R. 563.) Members of several different law-enforcement agencies then conducted a search for Gavin.
At approximately 9:45 p.m., Tony Holladay, a dog handler for the Limestone Correctional Facility, arrived at the scene with his beagle. Holladay testified that when he first arrived, he obtained information indicating that Investigator Smith had chased the suspect for approximately 20 yards, but had stopped short of the woods. At that point, Holladay said, he had Investigator Smith show him the exact spot he had stopped the pursuit so that the dog would not track Investigator Smith's trail from the roadway but would track the trail of the person who had entered the woods. Holladay testified that he then carried his dog to that spot and put him down. Holladay said that the dog immediately picked up a scent and tracked it into the woods to a creek. Holladay testified that he saw a man, whom he positively identified at trial as Gavin, standing in the creek under a bush, and that when Gavin saw him, Gavin attempted to flee. Holladay stated that he ordered Gavin to stop, but that Gavin did not stop until Holladay fired a shot over Gavin's shoulder.
Gavin was then handcuffed and several law-enforcement officers assisted in maneuvering Gavin out of the creek, up the embankment, and through the woods to the roadway. Kevin Ware, a deputy with the Cherokee County Sheriff's Department, testified that he participated in the search for Gavin and that he was present as Gavin was brought out of the creek. Deputy Ware stated that he heard Gavin say "I hadn't shot anybody and I don't have a gun." (R. 780.) The evidence indicated that from the time Gavin was discovered by Holladay to the time he made the statement in Deputy Ware's presence, no one had had any conversation with Gavin regarding the shooting or why he was being arrested.
The record reflects that Clayton was pronounced dead upon arrival at the hospital. A subsequent autopsy revealed three gunshot wounds to his body caused by two bullets. Stephen Pustilnik, a medical examiner with the Alabama Department of Forensic Sciences, testified that one bullet passed through Clayton's left arm, entered his chest on the left side damaging both of Clayton's lungs and his heart, and exited the right side of the chest. The record reflects that that bullet was later found lodged in the passenger-side door of the van. The second bullet, Dr. Pustilnik said, entered Clayton's left hip and lodged in his *930 back. Dr. Pustilnik testified that the wounds to Clayton's arm and hip would not have bled much because the bullets entered the muscles and the bleeding would have been contained inside those muscles. He stated that the wound to the chest would have bled quite a bit, and that, after blood filled the chest cavity, it would then exit the body at the lowest point. In addition, Dr. Pustilnik testified that there would not have been much "blow back" from the wounds, i.e., because the location of the wounds, the blood from the shots would not have blown backwards from the body toward the shooter. Dr. Pustilnik testified that the cause of Clayton's death was multiple gunshot wounds.
The record reflects that no "usable" fingerprints were found in the van and that no bloodstains were found on Gavin's clothing. (R. 926.) However, the State presented evidence indicating that a motel-room key was found in Gavin's pants pocket after his arrest; the key fit room 113 at the Super 8 Motel in Chattanooga where Meeks and Gavin had rented rooms. In addition, two .40 caliber shell casings were found in the street outside the Regions Bank in downtown Centre, one .40 caliber shell casing was found in the roadway at the intersection of Highways 48 and 68, and a red and black toboggan cap was found near the woods by the intersection of Highways 48 and 68. The bullet found lodged in the passenger-side door of the van and the bullet in Clayton's back were also determined to be .40 caliber. Although law enforcement was unable to find the murder weapon on the night of the crime, several days later, on March 13, 1998, a .40 caliber Glock pistol was found near the woods where Gavin had been discovered. The evidence indicated that the three shell casings and the two bullets had been fired from the pistol, and that the pistol belonged to Dewayne Meeks. The State also presented evidence indicating that in 1982, Gavin had been convicted of murder in Cook County, Illinois. Gavin had served approximately 17 years of a 34-year sentence and had been released on parole only a short time before Clayton's murder.
The State also presented the testimony of Barbara Genovese, a supervisor at the Cherokee County jail. Genovese testified that in April 1998, both Gavin and Meeks were incarcerated at the jail, in separate cells. At one point, Genovese said, when she got Meeks and another inmate out of their cells to take them outside for exercise, Gavin called out to her from his cell and asked if he could go outside and exercise with Meeks and the other inmate. Genovese said that she told Gavin that he could not go outside with Meeks, and that Gavin asked her why. According to Genovese, she told Gavin that he could not go outside with Meeks because when Meeks had initially been brought to the jail, Gavin had become loud and unruly, "screaming and yelling and banging on the doors." (R. 1001.) At that point, Genovese said, Gavin said "Dewayne didn't do anything ... I did it" and "Dewayne should not be in here." (R. 1002.) Genovese testified that she did not know what Gavin was referring to when he said "I did it." (R. 1002.)
On appeal, Gavin raises 30 issues, many of which he did not raise by objection in the trial court. Because Gavin was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
Rule 45A, Ala.R.App.P., provides:

*931 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that "`[t]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

I.
Gavin contends that "capital indictments are returned in an arbitrary and capricious or discriminatory manner in the ninth judicial circuit." (Issue I in Gavin's brief at p. 25.) Specifically, he argues that grand juries in the ninth judicial circuit, which includes Cherokee and DeKalb Counties, are twice as likely to return a capital indictment against an African-American defendant than against a Caucasian defendant when there are circumstances that qualify the offense as a capital offense, i.e., robbery, burglary, etc. According to Gavin, grand juries have a duty to indict defendants on the highest possible offense and the failure to indict Caucasian defendants for capital crimes in the ninth judicial circuit violates his right to equal protection, his right to due process, and his right to be free from cruel and unusual punishment. Therefore, Gavin concludes, his capital indictment should be dismissed and he should be reindicted for noncapital murder. Because Gavin raised this issue for the first time in his motion for a new trial, it was not timely. See Rule 15.2(a), Ala.R.Crim.P. ("[o]bjections based on defects in the commencement of the proceeding or in the charge, other than lack of subject matter jurisdiction or failure to charge an offense, may be raised only by pretrial motion as provided in Rule 15.3"), and Rule 15.3(a)(1), Ala.R.Crim.P. ("[a] motion under Rule 15.2 must be made ... at or before arraignment or by such later date as may be set by the court"). Thus, we may review it only for plain error. See Rule 45A, Ala.R.App.P.
In his motion for a new trial, filed on February 4, 2000, and at the hearing on his motion for a new trial,[1] Gavin argued that there was a statistical disparity in capital indictments in the ninth judicial circuit, which, he claimed, showed that *932 capital indictments were returned in a discriminatory manner. He argued that of the total number of crimes he claimed were committed in the ninth judicial circuit between 1992 and 2000 that qualified for capital treatment, 86 percent were indicted capitally, but only 50 percent of those capital-qualifying crimes committed by Caucasians were treated as capital offenses in the indictments. He also maintained that although African-Americans constituted roughly 3 percent of the population in the ninth judicial circuit, approximately 40 percent of the capital indictments returned in that circuit were against African-American defendants. In support of his motion for a new trial, he presented statistical evidence regarding the number of murder indictments in the ninth judicial circuit and the race of the defendants in those cases; the number of those cases that he claimed were eligible for treatment as capital; and the number of those cases that were indicted capitally. In addition, he presented the testimony of several law-enforcement officers with the DeKalb County Sheriff's Department and with the Fort Payne Police Department regarding several homicides that had occurred in DeKalb County that, he said, should have been indicted capitally, but that were not solely because the defendants were Caucasian.
With respect to his equal-protection claim, Gavin presented no evidence indicating that the grand jury that indicted him did so with a discriminatory purpose. "[A] defendant who alleges an equal protection violation has the burden of proving `the existence of purposeful discrimination.'" McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), quoting Whitus v. Georgia, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). Gavin presented no evidence specific to his own case that would support an inference that race played a role in his being indicted for capital murder; he presented only evidence regarding other indictments in the ninth judicial circuit. However, for the reasons set forth below, this evidence was not sufficient to raise an inference of discrimination for purposes of equal protection, or to show a violation of due process or the prohibition against cruel and unusual punishment.
First, Gavin's argument is based on the return of indictments in the ninth judicial circuit as a whole, not the return of indictments in the county in which he was indicted ÔÇö Cherokee County. All of Gavin's statistics and all of the evidence he presented at the hearing on the motion for a new trial focused on the ninth judicial circuit as a whole ÔÇö in fact, all of his testimonial evidence from law-enforcement officers concerned crimes committed in DeKalb County. However, grand juries are drawn from counties, not circuits. See  12-16-1 et seq., Ala.Code 1975; Rule 12, Ala.R.Crim.P. Therefore, even if DeKalb County grand juries were returning indictments in a discriminatory fashion, that fact would not affect Gavin's constitutional rights because he was not indicted in DeKalb County; he was indicted in Cherokee County. The statistics Gavin presented to the trial court in support of his motion for a new trial reflect that all of the homicides he claimed were eligible for capital treatment in Cherokee County were, in fact, indicted capitally.[2] (C. 340-42.) Gavin has failed to show that capital indictments in Cherokee County, the county in which *933 he was indicted, are returned in an arbitrary, capricious, or discriminatory manner; therefore, he has failed to show a violation of his constitutional rights.
Second, even if we were to consider the evidence and statistics regarding the crimes in DeKalb County, we would still find that Gavin has failed to show that indictments in the ninth judicial circuit are returned in an arbitrary, capricious, or discriminatory manner. Gavin's argument is premised on the assumption that grand juries are under an affirmative duty to indict for the highest possible offense. Gavin has cited no law, and we have found none, that supports that assertion.[3] Rule 12.3(c)(1), Ala.R.Crim.P., provides that grand juries have a duty to "[i]nquire into all indictable offenses committed or triable within the county," and Rule 12.3(d)(1), Ala.R.Crim.P., provides that grand juries have the authority to return indictments. However, nothing in Rule 12.3 states that grand juries have an affirmative duty to indict in all circumstances as Gavin appears to contend.
In addition, after thoroughly reviewing all of the evidence Gavin presented regarding those cases in DeKalb County that he claims should have been indicted capitally, we note that most of the cases about which Gavin complains were clearly not capital eligible,[4] and, based on the limited evidence Gavin actually presented regarding the crimes, it is highly questionable whether the remaining cases were capital eligible.[5]
*934 Furthermore, Gavin's evidence consisted solely of the testimony of various law-enforcement personnel who investigated the crimes regarding what they had discovered during their respective investigations. However, Gavin presented no evidence indicating, and he does not argue, that the testimony he presented at the hearings on the motion for a new trial was the same testimony that was presented to the grand juries that returned the indictments in those cases. "[I]t is within the discretion of the district attorney to call or not to call certain witnesses in the presentation of the offense before the grand jury although those witnesses are subpoenaed by the district attorney, the foreman of the grand jury or the clerk of the circuit court, `on the application of the grand jury.'" Allen v. State, 380 So.2d 313, 327 (Ala.Crim.App.1979), quoting  12-16-197, Ala.Code 1975. Therefore, even if the circumstances surrounding these crimes contained a capital-qualifying element, as Gavin contends, we do not know whether any evidence of the capital element, i.e., burglary, robbery, etc., was actually presented to the grand jury. Nor do we know whether the district attorney chose to pursue a capital charge with respect to any of these crimes. "`[I]f a prosecutor has possible cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, rests entirely in his discretion.'" Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907, 910 (Ala.1992), quoting 63A Am.Jur.2d Prosecuting Attorneys  24 (1984)(emphasis added). For all we know, in the cases Gavin claims were capital, the prosecutor chose not to pursue a capital charge with the grand jury, or failed to present witnesses who could have given testimony indicating that there was a circumstance that qualified the offense as capital.
Based on the evidence presented, we conclude that Gavin failed to prove that capital indictments in the ninth judicial circuit are returned in an arbitrary, capricious, or discriminatory manner. Therefore, we find no error, plain or otherwise, as to this claim.

II.
Gavin contends that  13A-5-40(a)(13), Ala.Code 1975, is unconstitutional. (Issue III in Gavin's brief.)
Section 13A-5-40(a)(13) provides:
"(a) The following are capital offenses:
"....
"(13) Murder by a defendant who has been convicted of any other murder in the 20 years preceding the crime; provided that the murder which constitutes the capital crime shall be murder as defined in subsection (b) of this section; and provided further that the prior murder conviction referred to shall include murder in any degree as defined at the time and place of the prior conviction."
(Emphasis added.)
Gavin contends that the 20-year limit in  13A-5-40(a)(13) is arbitrary and that it violates his equal-protection and due process rights, and the ban on cruel and unusual punishment. Gavin concedes that in Hubbard v. State, 382 So.2d 577 (Ala.Crim.App.1979), aff'd, 382 So.2d 597 (Ala.1980), *935 judgment set aside on other grounds, 405 So.2d 695 (Ala.1981), this Court upheld  13-11-2(a)(13), Ala.Code 1975 (repealed),[6] the predecessor to  13A-5-40(a)(13), against these same constitutional attacks. See also Carroll v. State, 599 So.2d 1253 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993)(applying Hubbard to  13A-5-40(a)(13)). Nevertheless, he requests that we overrule Hubbard. We decline to do so. For the reasons stated in Hubbard, the 20-year limit in  13A-5-40(a)(13) is not unconstitutional.
Gavin also contends that  13A-5-40(a)(13) violates equal protection guarantees and the ban on cruel and unusual punishment when it provides that the prior murder conviction "shall include murder in any degree as defined at the time and place of the prior conviction." Gavin argues that because some jurisdictions define as "murder" conduct that would constitute only "manslaughter" in Alabama, such as provocation manslaughter, a person convicted of a provocation homicide in a jurisdiction labeling that crime as a degree of "murder," upon committing a subsequent murder in Alabama, would be eligible for capital treatment merely because the prior crime was labeled a "murder" in that jurisdiction, while if the same person had been convicted of the provocation homicide in Alabama, he or she would not be eligible for capital treatment for a subsequent murder because the prior crime was "manslaughter" in Alabama, not "murder." According to Gavin, because "the determining factor in qualifying a murder as capital [under  13A-5-40(a)(13)] is not the conduct of the party, but the statutory nomenclature of the jurisdiction in which the predicate murder conviction was obtained ... the statute acts to create materially different outcomes for identical behaviors." (Gavin's brief at p. 67.) In addition, Gavin argues that the statute's "deference to the criminal codes of other jurisdictions" is an unconstitutional delegation of the legislature's power to define crimes. (Gavin's brief at p. 67.)
In J.L.N. v. State, [Ms. CR-00-2209, October 25, 2002] ___ So.2d ___ (Ala.Crim.App.2002), this Court stated:
"`"A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations. Broadrick v. Oklahoma, 413 U.S. 601, 610 [93 S.Ct. 2908, 2914, 37 L.Ed.2d 830] (and cases cited)."'"
`[Ulster County Court v. Allen,] 442 U.S. [140,] 154-55, 99 S.Ct. [2213,] 2223 [60 L.Ed.2d 777] [(1979)].'
"Taylor v. State, 442 So.2d 128, 130-31 (Ala.Crim.App.1983). In State v. Woodruff, 460 So.2d 325, 327 (Ala.Crim.App.1984), we addressed the question whether the trial court properly addressed Woodruff's claim that  13A-6-65(a)(3), Ala.Code 1975, was unconstitutional because, Woodruff alleged, it violated `the right of privacy of consenting adults to engage in deviate sexual intercourse.' In finding that the trial court did not properly address the claim, we held:
"`In reviewing the propriety of the trial court's holding that the sexual misconduct statute is unconstitutional *936 on its face, our threshold consideration is whether the trial court properly disregarded the following prudential rule of judicial self-restraint in allowing Woodruff to raise the question of the facial invalidity of the statute as applied to others:
"`"[O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional...."'"

United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).
"`This court, as well as our Supreme Court, has previously recognized and applied this traditional rule of standing. For example, in Bland v. State, 395 So.2d 164, 166 (Ala.Crim.App.1981), we cited County Court of Ulster County v. Allen, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979), for the following general proposition: "A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights; as a general rule, if there is no constitutional defect in the application of a statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations." In State v. Wilkerson, 54 Ala.App. 104, 305 So.2d 378, 380, cert. denied, 293 Ala. 774, 305 So.2d 382 (1974), in finding that the appellant could not challenge the constitutionality of a statute because he could not show that the statute's unconstitutional feature adversely affected him, we cited the general rule, as follows:'"
"`... in criminal prosecution, accused has the right to assert the invalidity of the law, regulation, or rule under which he is being prosecuted, but he must show that his rights are adversely affected by the statute or ordinance, and, more particularly, that his rights are thus affected by the particular feature of the statute alleged to be in conflict with the constitution. It is not sufficient that the statute may impair the rights of others. An accused affected by one portion of a statute may not plead the invalidity of another portion of the same statute not applicable to his case, where the invalidity of the portion questioned will not render void the entire act or at least some provision that does affect him adversely; but, conversely, he may do so where the invalidity of the portion questioned would render the entire act, or some provision affecting him, void ....'" (quoting 16 C.J.S. Constitutional Law  84).
"`Appellate courts will not pass upon a constitutional question unless some specific right of the appellant is directly involved; the appellant must belong to that class affected by the statute's provisions. McCord v. Stephens, 295 Ala. 162, 325 So.2d 155 (1975); Evans v. State, 338 So.2d 1033 (Ala.Crim.App.1976), cert. denied, 348 So.2d 784 (Ala.1977); Bozeman v. State, 7 Ala.App. 151, 61 So. 604, cert. denied, 183 Ala. 91, 63 So. 201 (1913). Even under the circumstances where a constitutional attack on a statute may be presented to the trial court prior to trial and, consequently, without benefit of a trial record, adherence to the traditional concepts of standing is required. See, e.g., State v. Friedkin, 244 Ala. 494, 14 So.2d 363 (1943); *937 State v. Wilkerson, supra; People v. Allen, 657 P.2d 447 (Colo.1983); State v. Raybon, 242 Ga. 858, 252 S.E.2d 417 (1979); State v. Price, 237 N.W.2d 813 (Iowa 1976), appeal dismissed, 426 U.S. 916, 96 S.Ct. 2619, 49 L.Ed.2d 370 (1976); People v. Jose L., 99 Misc.2d 922, 417 N.Y.S.2d 655 (N.Y.Crim.Ct.1979); Commonwealth v. Bonadio, 490 Pa. 91, 415 A.2d 47 (1980); Commonwealth v. Hughes, 468 Pa. 502, 364 A.2d 306 (1976)....
"`....
"`... [T]he question of a statute's validity can not be determined abstractly, but rather should be determined only as it applies and is to be enforced in the specific case before the court. Because Woodruff did not claim or argue that his right to privacy has been violated by the statute's application to him, he has not met his burden of demonstrating that the statute is unconstitutional as applied to him. The transcript is totally devoid of evidence indicating that Woodruff's right to privacy was violated; the trial court declared the statute unconstitutional after a brief oral argument and without benefit of any evidence. Moreover, the complaint, charging Woodruff in the general statutory language, offers no indication of the factual setting in which the violation occurred.
"`On this record, the trial court should have refrained from determining the statute's constitutionality; furthermore, we will not express any opinion as to whether the "penumbral" right to privacy, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), should be extended to protect the freedom to indulge in sexual practices which have long been prohibited by our laws. "Where the question of the constitutionality of a statute is distinctly presented, and is necessary to the decision of the particular case, the courts do not hesitate to decide the question," Bray v. State, 140 Ala. 172, 37 So. 250, 251-252 (1904), but resolution of a constitutional question should not be predicated on supposition or speculation of the facts. Whitten v. City of Atmore, 278 Ala. 70, 175 So.2d 764, 766 (1965). We are bound by the principles espoused by the Supreme Court of Alabama in State v. Montgomery, 177 Ala. 212, 59 So. 294, 296 (1912):
"`"It is the established rule of this court to decline to pass upon the constitutional validity of legislative enactments, unless the determination of the questions and rights then before it requires their decision. Smith v. Speed, 50 Ala. 276 [(1874)]; Bray v. State, 140 Ala. 172, 179, 37 South. 250 [1904]; Hill v. Tarver, 130 Ala. 592, 30 South. 499 [1901].... [T]his court will not decide any constitutional question respecting the validity of legislation, unless its decision thereupon is `indispensable' [to] the determination of that litigation. Wisdom and a just respect for the Legislature suggest and approve these rules."
"`....
"`Because the question of the constitutionality of  13A-6-65(a)(3) comes before this court without the benefit of "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions," Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), we decline to pass upon this "ill-defined controversy." See People v. Rice, 41 N.Y.2d *938 1018, 395 N.Y.S.2d 626, 363 N.E.2d 1371 (1977); Commonwealth v. Cook, 468 Pa. 249, 361 A.2d 274 (1976). Because Woodruff has not shown himself to be entitled to raise the question, this court will "leave the question of constitutional power to be passed upon when a case arises which cannot be otherwise disposed of, and which, consequently, renders a decision upon such question necessary." Speed v. Smith, 50 Ala. 276, 283 (1874), quoting Cooley on Cons.Lim. 163. It is our duty to sustain legislative acts unless we are convinced beyond a reasonable doubt of their unconstitutionality. Ex parte McCurley, 390 So.2d 25 (Ala.1980). This case is infested with grave doubt concerning any unconstitutional application of  13A-6-65(a)(3) to Woodruff; therefore, we leave this delicate constitutional issue for the proper case.'
"Woodruff, 460 So.2d at 327-31 (footnotes omitted)."
___ So.2d at ___.
Gavin does not claim that  13A-5-40(a)(13) is unconstitutional as applied to him, i.e., he does not argue that the conduct underlying his prior murder conviction in Illinois does not constitute "murder" in Alabama or that he is being treated more harshly than individuals whose prior conduct was similar to his. Rather, Gavin's sole argument is that  13A-5-40(a)(13) may violate the constitutional rights of someone at some point in the future. Gavin does not have standing to argue that  13A-5-40(a)(13) is unconstitutional if applied to third parties in hypothetical situations.
The record reflects that the prior conduct underlying Gavin's prior murder conviction falls within the definition of murder in  13A-6-2, Ala.Code 1975[7]; therefore,  13A-5-40(a)(13) is constitutional as applied to Gavin. We decline to reach the question of the constitutionality of  13A-5-40(a)(13) in any other situation.

III.
Gavin contends that he was denied a fair and impartial trial because of pretrial publicity, which he claims was extensive and prejudicial. (Issue XI in Gavin's brief.) According to Gavin, there was extensive coverage of the case in newspapers "not only in Cherokee County, but also from daily newspapers in ... nearby cities" that "saturated the small media market of Cherokee County." (Gavin's brief at pp. 111-12.) Because Gavin raised this issue for the first time in his motion for a new trial,[8] it was untimely. See, e.g., Williams v. State, 710 So.2d 1276, 1322 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997). Therefore, we may review it only for plain error. See Rule 45A, Ala.R.App.P.
"`"A defendant is entitled to a change of venue if he can demonstrate to the trial court that he cannot receive a fair and impartial trial in the county where he is to be tried. Ala.Code,  15-2-20 (1975); Nelson v. State, 440 So.2d 1130 (Ala.Crim.App.), cert. denied, 440 So.2d 1130 *939 (Ala. [Crim.App.]1983); Anderson v. State, 362 So.2d 1296 (Ala.Crim.App.1978).
"`"`There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pre-trial publicity "has so saturated the community as to have a probable impact on the prospective jurors" and thus renders the trial setting "inherently suspect." McWilliams v. United States, 394 F.2d 41 (U.S.C.A. 8th Cir.1968); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a "pattern of deep and bitter prejudice" must exist in the community. Irvin v. Dowd, [366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)] supra.
"`"`The second situation occurs when the defendant shows "a connection between the publicity generated by the news articles, radio and television broadcasts in the existence of actual prejudice." McWilliams v. United States, supra.'"
"`"Nelson, 440 So.2d at 1131-32."
"`Thomas v. State, 539 So.2d 375 (Ala.Crim.App.1988). See also Robinson v. State, 430 So.2d 883 (Ala.Crim.App.1983).'
"Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
"Thus, a change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make the `court proceedings nothing more than a "hollow formality,'" Hart v. State, 612 So.2d 520, 526-27 (Ala.Cr.App.), affirmed, 612 So.2d 536 (Ala.1992), cert. denied, [508] U.S. [953], 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In order to show community saturation, the appellant must show more than the fact `that a case generates even widespread publicity.' Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). "`Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].'" Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977)."
Oryang v. State, 642 So.2d 979, 982-83 (Ala.Crim.App.1993). Moreover, "the passage of time is a factor that can bring objectivity to a case in which the pretrial publicity has been extensive." Ex parte Travis, 776 So.2d 874, 878 (Ala.2000).
Gavin has failed to establish that the pretrial publicity in this case so "pervasively saturated" the community as to render the court proceedings nothing more than a "hollow formality" or that he suffered actual prejudice. Oryang, at 983. Gavin cites to only one newspaper article that was printed shortly after his arrest; he offers nothing more than the bare assertion that the record, in particular the juror questionnaires, shows that the "case received near saturation coverage." (Gavin's *940 brief at p. 111.) The juror questionnaires reflect that approximately half of the prospective jurors had read or heard about the case through media coverage; the majority of those, however, indicated that they had only heard about it when it had first happened, approximately 20 months before the trial.
"[A]s the Alabama Supreme Court stated in Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985):"
"`"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court...."
"`The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, "the proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).'
"479 So.2d at 80. `"`The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.' Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984)."' Siebert v. State, 562 So.2d 586, 589 (Ala.Cr.App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990)."
Whitehead v. State, 777 So.2d 781, 801-02 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000). There is no indication in the record, and Gavin does not argue otherwise, that any juror had a fixed opinion of Gavin's guilt or that the verdicts were not impartially rendered on the evidence presented at trial.
Therefore, we find no error, plain or otherwise, as to this claim.

IV.
Gavin contends that the trial court erred in denying his pretrial requests to remove his appointed counsel. (Issues IV and X in Gavin's brief.) Gavin makes two arguments in this regard; we address each in turn.

A.
First, Gavin contends that the trial court erred in denying his written pretrial motion to remove both his appointed counsel.
The record reflects that on September 28, 1998, over 13 months before his trial began in early November 1999, Gavin filed a pro se motion with the trial court requesting that his appointed counsel, Bayne Smith and John Ufford, be removed and that new counsel appointed. He listed the following grounds in his motion: (1) "conflict of interest"; (2) "ineffective assistance of counsel"; (3) "misrepresentation"; and (4) "plain lack of interest." (C. 17.) At a hearing on October 13, 1998, Gavin withdrew the motion. He indicated to the trial court that he was satisfied with counsel's representation and that he believed they were acting in his best interests. He also told the court that, although there had *941 been some issues with respect to counsel's availability to meet with him and discuss the case, "we got everything understood now as far as the availability of me seeing them when I need to see them about certain matters." (R. 9.) At a subsequent hearing on November 2, 1998, the trial court again mentioned Gavin's pro se motion to remove his appointed counsel and inquired whether Gavin was still satisfied with Smith and Ufford's representing him, to which Gavin replied that he was.
On July 14, 1999, a little over three months before his trial began, Gavin filed a pro se motion "To Renew Motion to Dismiss Counsel." (C. 69.) In that motion, Gavin indicated that he wanted to renew his previous motion to dismiss counsel on the same grounds listed in the previous motion and to have new counsel appointed to represent him. The trial court held a hearing on the motion on August 10, 1999. At the hearing, Gavin stated that he did not feel his attorneys were putting enough "emphasis" on his innocence; that they were not ready for trial; that they were "biased and inaccurate"; that he and Smith did not "agree upon anything whatsoever" and had had a conflict from the beginning; that they had not investigated the case properly or interviewed the witnesses in Chicago whom he had asked them to talk with; and that they were not keeping him informed of the progress in the case. (R. 1552.) Gavin requested that new counsel be appointed who were "not acquainted or associated with the surrounding counties of Cherokee [and] not familiar with the publicity surrounding the case." (R. 1553.) In response to Gavin's complaints, Smith[9] told the court that he was prepared to go to trial; that he had hired an investigator and a mitigation expert to investigate the various leads Gavin had provided them with; and that the investigator was traveling to Chicago that day to investigate the witnesses referred to by Gavin and that the only reason the investigator had not gone to Chicago earlier was because the court had only recently authorized the funds for the trip. After hearing from Gavin and Smith, the court noted that, based on what it had seen, Gavin's attorneys had spent an "impressive amount of time and effort" on the case and had, in fact, convinced the court to authorize more funds than it had ever authorized in any other case. (R. 1557.) In addition, the prosecutor noted for the record that he and his staff had had more contact with defense counsel in preparation for this case than in any other case he had tried and that he believed Gavin's attorneys had done a great deal of work on Gavin's behalf. The court took the motion under advisement and issued an order denying the motion on August 12, 1999.
"`An indigent defendant who cannot afford to retain an attorney has an absolute right to have counsel appointed by the Court in all criminal proceedings in which representation by counsel is constitutionally required. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Strickland v. State, 280 Ala. 31, 189 So.2d 771 (1965); U.S. Const. amend. V and XIV; Art. I, Ala. Const.1901,  6; Ala.Code 1975,  15-12-21; Ala.R.Crim.P. 6.1. While an indigent defendant may have the right to be represented by counsel, he has no absolute right to be represented by any particular counsel or by counsel of his choice. Briggs v. State, 549 So.2d 155 (Ala.Cr.App.1989). The essential aim *942 of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant. Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The Sixth Amendment does not guarantee a defendant a meaningful relationship, rapport, or even confidence in court-appointed counsel. Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); Siers v. Ryan, 773 F.2d 37 (3d Cir.1985), cert. denied, 490 U.S. 1025, 109 S.Ct. 1758, 104 L.Ed.2d 194 (1989).'
"Snell v. State, 723 So.2d 105, 107 (Ala.Crim.App.1998).
"`"[T]he decision whether to remove an appointed counsel and appoint another counsel for defendant is within the sound discretion of the trial court." Crawford v. State, 479 So.2d 1349, 1355 (Ala.Cr.App.1985). See also, Tudhope v. State, 364 So.2d 708 (Ala.Cr.App.1978).... The right to choose counsel may not be subverted to obstruct the orderly procedure in the court or to interfere with the fair administration of justice. United States v. Sexton, 473 F.2d 512 (5th Cir.1973).'"

Briggs v. State, 549 So.2d 155, 160 (Ala.Crim.App.1989).
"`In order to prevail on a motion for substitution of counsel, the accused must show a demonstrated conflict of interest or the existence of an irreconcilable conflict so great that it has resulted in a total lack of communication that will prevent the preparation of an adequate defense.' Snell v. State, supra, at 107."
Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ___, ___ (Ala.Crim.App.2001).
Gavin has failed to show that his counsel had a conflict of interest or that there was a "total lack of communication" between him and his counsel that would have prevented the preparation of an adequate defense. At most, Gavin lacked confidence in his attorneys, and he and his counsel lacked "a meaningful relationship." However, neither of those qualities are guaranteed by the Sixth Amendment. The trial court did not abuse its discretion in denying Gavin's pretrial motion to remove his appointed counsel.

B.
Second, Gavin contends that the trial court erred in denying his oral motion to remove his appointed counsel made on the second day of jury selection.
The record reflects that at the beginning of the second day of jury selection, after the trial court had qualified the venire and divided it into panels, and after the venire had completed the juror questionnaires, Gavin orally moved for a mistrial and to have his lead attorney, Bayne Smith, removed as counsel on the grounds of "conflict of interest, misrepresentation, and poorly [sic] advisement."[10] (R. 293.) Gavin told the court that he and Smith had been "bickering back and forth about the truth, the facts, the evidence, and the law" and that, in the last day, Smith had been pressuring him to accept a plea offer from the prosecutor. (R. 294.) He stated, however, that his relationship with his second attorney, John Ufford, was "neutral," but noted that Ufford "shares the same views of Mr. Smith" and that when he had asked Ufford to take over as lead counsel before trial, Ufford had declined. (R. 296.) In response to Gavin's claim that Smith had been pressuring him to accept a plea agreement, the trial court noted: "[I]t appears to me that no such pressure has *943 resulted in any inappropriate or improper result. I mean, you've resisted any such pressure, you're here today having rejected any suggestion or any offer." (R. 301.) The trial court then denied Gavin's motions.
On appeal, Gavin contends that the trial court's denial of his motion to remove Smith as his lead counsel denied him his right to represent himself because, he says, he made a "particularized request to proceed pro se." (Gavin's brief at p. 74.) The record refutes this claim. Contrary to Gavin's contention, at no point during the colloquy did he request to proceed pro se. In addition, a review of the colloquy clearly shows that Gavin did not want to proceed pro se. As the State correctly points out in its brief to this Court, Gavin's request to remove his counsel was directed solely at Smith. Gavin specifically stated that he and Smith had been having problems communicating, but that his relationship with Ufford was "neutral," and he never requested that Ufford be removed as his counsel, thus indicating that he did not, in fact, want to proceed pro se. However, even assuming that Gavin's request was directed at both Smith and Ufford, Gavin did not merely move to have counsel removed, he requested a mistrial, thus further showing that he did not want to proceed pro se, but that he wanted the trial delayed so that new counsel could be appointed. Contrary to Gavin's contention, his right to represent himself is not implicated in this case. See, e.g., Ex parte Clemons, 720 So.2d 985 (Ala.1998).
We find no abuse of discretion on the part of the trial court in denying Gavin's oral motion to remove his counsel. Gavin alleged only that he and Smith had been "bickering" about the facts, the evidence, and the law, and that Smith had been pressuring him to accept a plea agreement. As the trial court correctly noted, Gavin obviously withstood whatever "pressure" Smith allegedly placed on him ÔÇö he rejected the plea offer. In addition, Gavin's apparent disagreement with Smith about the facts, the evidence, and the law was simply not sufficient to warrant removing Smith as counsel. As this Court noted in Cox v. State, 489 So.2d 612 (Ala.Crim.App.1985):
"`A defendant is entitled to counsel capable of rendering competent, meaningful assistance in the preparation and trial of the pending charges, including appropriate evaluation and advice with reference to a plea of guilty. A defendant is not entitled to an attorney who agrees with the defendant's personal view of the prevailing law or the equities of the prosecutor's case. A defendant is entitled to an attorney who will consider the defendant's views and seek to accommodate all reasonable requests with respect to trial preparation and trial tactics. A defendant is entitled to an appointment of an attorney with whom he can communicate reasonably, but has no right to an attorney who will docilely do as he is told. Every defendant is entitled to the assistance of counsel dedicated to the proposition, and capable of assuring that, the prosecution's case shall be presented in conformity with the Constitution, rules of evidence and all other controlling rules and practices. No defendant has a right to more.' United States v. Moore, 706 F.2d 538, 540 (5th Cir.), cert. denied, 464 U.S. 859, 104 S.Ct. 183, 78 L.Ed.2d 163 (1983)."
489 So.2d at 622. (Some emphasis in Cox; some emphasis added.) The trial court did not err in denying Gavin's oral motion to remove his counsel.

V.
Gavin contends that he was denied a fair and impartial trial because, he says, *944 African-Americans are systematically excluded from grand-jury and petit-jury venires in Cherokee County. (Issue V in Gavin's brief.) He argues that the jury-selection process in Cherokee County violates the fair-cross-section requirement of the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment. Because Gavin raised this issue for the first time in his motion for a new trial, it was not timely. See, e.g., Sistrunk v. State, 630 So.2d 147 (Ala.Crim.App.1993). Therefore, we review it only for plain error. See Rule 45A, Ala.R.App.P.
At the hearing on his motion for a new trial, Gavin introduced into evidence the list of jurors who had been summoned for grand jury service the week that he was indicted; the list of the jurors who had served on the grand jury that indicted him; the list of jurors who had been summoned for jury service the week of his trial; 1990 census data listing the number of African-Americans in Cherokee County by age group; and 1990 census data listing the number of African-Americans in Cherokee County who owned vehicles and the number of African-Americans who did not own vehicles. In addition, Gavin argued that 6.6% of the population in Cherokee County was African-American,[11] but that, due to systematic undercounting of African-Americans, it "should be presumed that the situation is worse than the calculations indicate." (R. 1436.)
With respect to the grand jury that indicted Gavin, the record indicates that 160 people were summoned for grand jury service that week, of which 6, or 3.75%, were African-American. Several of the summonses went undelivered and several jurors were excused or disqualified. The panel from which the grand jury was selected consisted of 45 people, of which 1, or 2.22%, was African-American. All 18 members of the grand jury that indicted Gavin were Caucasian. With respect to the petit jury venire, the record reflects that 300 people were summoned for jury service, of which 16, or 5.33%, were African-American. Subtracting those summonses that were undelivered and those jurors who were disqualified or excused by the court, 67 people served on the venire from which Gavin's petit jury was selected, of which 6, or 8.95%, were African-American. The jury that convicted Gavin consisted of 11 Caucasians and 3 African-Americans.
Gavin presented no evidence as to the process Cherokee County uses to summon its jurors, and the record is not entirely clear on that point. During the first hearing on Gavin's motion for a new trial, the prosecutor indicated that jurors are randomly selected from lists of licensed drivers in Cherokee County produced by the Administrative Office of Courts. At the second hearing on Gavin's motion for a new trial, the trial court indicated that, in addition to driver's licenses, identification cards may also be used in the process, although the court indicated that it was not sure whether that was true or not. However, as noted above, Gavin introduced evidence of the number of African-Americans in Cherokee County who did and did not own vehicles, and, based on that evidence, he argued to the trial court that the percentage of African-Americans who do not own vehicles was significantly higher than the percentage of Caucasians *945 who do not own vehicles and that, therefore, the use of driver's licenses to summon jurors systematically excludes a large portion of the African-American population in Cherokee County. Given the lack of evidence as to the selection process used in Cherokee County and Gavin's argument at the hearing on his motion for a new trial, which was based on the assumption that Cherokee County used driver's licenses to summon jurors, we assume for purposes of addressing this issue that Cherokee County randomly selects its jurors from lists of licensed drivers.[12]
"[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Under the Sixth Amendment, "petit juries must be drawn from a source fairly representative of the community"; however, an accused is "not entitled to a jury of any particular composition." Id. at 538, 95 S.Ct. 692. "`[I]t is the source from which the venire is selected that must be fairly representative of the community, rather than the jury actually chosen.'" Gamble v. State, 791 So.2d 409, 425 (Ala.Crim.App.2000), quoting Travis v. State, 776 So.2d 819, 838 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000). As this Court noted in Sistrunk:
"[T]he fair cross-section requirement `ensures only a venire of randomness, one free of systematic exclusion. It does not ensure any particular venire.' Note, United States v. Gelb: The Second Circuit's Disappointing Treatment of the Fair Cross-Section Guarantee, 57 Brook.L.Rev. 341, 343 n. 7 (1991). `Rather than being entitled to a cross-sectional venire,' a defendant `has a right only to a fair chance, based on a random draw, of having a jury drawn from a representative panel.' Comment, The Cross-Section Requirement and Jury Impartiality, 73 Cal.L.Rev. 1555, 1565 (1985). See Johnson v. State, 502 So.2d 877, 880 (Ala.Cr.App.1987) (venire need not be '"a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group" '). Cf. United States v. Percival, 756 F.2d 600, 615 (7th Cir.1985)(`It is the master jury wheel, not the actual grand jury, which must represent a fair cross section of the community. So long as the master jury wheel is adequate and the prescribed procedure is thereafter followed, there can be no complaint that the panel ultimately produced by random selection is somehow underrepresentative in result.') (citations omitted)."
630 So.2d at 149-50. "When raising a claim under [the fair-cross-section] requirement, a defendant `has the burden of establishing a prima facie case of a "fair cross section" violation.'" Id. at 149, quoting Pierce v. State, 576 So.2d 236, 241 (Ala.Crim.App.1990).
"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."
*946 Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).
Gavin has satisfied the first prong of the Duren test ÔÇö African-Americans are a distinctive group in the community. However, he has failed to establish the second and third prongs of the Duren test ÔÇö he has not shown that African-Americans are not fairly and reasonably represented on grand and petit jury venires in Cherokee County and that any suggested underrepresentation of African-Americans on grand and petit jury venires in Cherokee County is the result of systematic exclusion inherent in the jury-selection process.
"`"The third Duren [v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)] element ÔÇö that there has been a systematic exclusion of a distinctive group ÔÇö constrains a defendant to establish that `the cause of the underrepresentation was ... inherent in the particular jury-selection process utilized.' Duren, 439 U.S. at 366, 99 S.Ct. at 669." Sistrunk v. State, 630 So.2d at 149. Additionally, "with regard to the second and third Duren elements, a defendant asserting a fair cross-section violation `must demonstrate ... not only that [blacks] were not adequately represented on his jury venire, but also that this was the general practice in other venires.' Timmel v. Phillips, 799 F.2d 1083, 1086 (5th Cir.1986)." Sistrunk v. State, 630 So.2d at 150.'"
Travis, 776 So.2d at 838, quoting Stanton v. State, 648 So.2d 638, 640-41 (Ala.Crim.App.1994). "In the absence of a showing of systematic exclusion, the showing of a disparity between the percentage of blacks in the population of the county in which venue is situated and the percentage of blacks on the venire does not establish a violation of the fair cross-section requirement." Stewart v. State, 623 So.2d 413, 415 (Ala.Crim.App.1993).
As noted above, Gavin presented evidence regarding the composition of the grand-jury and petit-jury venires in his case. That evidence indicated that African-Americans were underrepresented on the grand jury venire, but that they were overrepresented on the petit jury venire.[13] However, he failed to present any evidence regarding the composition of other grand and petit jury venires in Cherokee County. He also failed to show that there was any systematic exclusion of Africans-Americans inherent in the jury-selection process." `Random selection from a list of licensed drivers has been held to be an acceptable manner in which to select a jury.'" Acklin v. State, 790 So.2d 975, 985 (Ala.Crim.App.2000), quoting Stanton, 648 So.2d at 641. See also Carroll v. State, 852 So.2d 801 (Ala.Crim.App.1999), aff'd in pertinent part, remanded on other grounds, 852 So.2d 821 (Ala.2001), on return to remand, 852 So.2d 830 (Ala.Crim.App.2001), rev'd on other grounds, 852 So.2d 833 (Ala.2002), and the cases cited therein. Although Gavin introduced evidence indicating that the percentage of African-Americans in Cherokee County who do not own vehicles is higher than the percentage of Caucasians in Cherokee County who do not own vehicles, as the prosecutor correctly pointed out at the hearing on the motion for a new trial, merely because someone does not own a vehicle does not mean that *947 person does not have a driver's license. Thus, Gavin's statistics regarding vehicle ownership do not overcome the well-established law upholding the use of driver's licenses in summoning juries. Gavin has failed to establish a violation of the fair-cross-section requirement in the selection of grand-jury and petit-jury venires in Cherokee County.
Likewise, Gavin has failed to establish an equal-protection violation in the selection of grand-jury and petit-jury venires in Cherokee County. To prove an equal-protection violation in the context of jury selection, an accused has the burden to establish that the jury-selection process employed resulted in the substantial underrepresentation of a cognizable group in the community. See Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The accused must establish: (1) that the group alleged to have been excluded "is one that is a recognizable, distinct class"; (2) that the group has been substantially underrepresented on jury venires "over a significant period of time"; and (3) that there was purposeful discrimination against members of the underrepresented group, which will be presumed if the selection procedure "is susceptible of abuse or is not racially neutral." Id. at 494, 97 S.Ct. 1272.
As noted above, African-Americans are a distinct group; thus, Gavin has established the first element under Castaneda. However, also as noted above, Gavin failed to establish that African-Americans have been underrepresented on jury venires in Cherokee County over a period of time; he only presented evidence of the composition of the grand-jury and petit-jury venires in his case. Finally, Gavin has not established, nor has he alleged, purposeful discrimination, and we conclude that random selection of jurors from a list of licensed drivers is a race-neutral selection process not susceptible of abuse.
Therefore, we find no error, plain or otherwise, as to this claim.

VI.
Gavin contends that the trial court erred in denying his motion made pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), because, he says, the State improperly struck jurors on the basis of their race. (Issue VI in Gavin's brief.)
After the jury was struck, was administered the oath, was given preliminary instructions regarding sequestration and the format the trial would take, and was recessed for the evening, Gavin made the following objection to the State's peremptory strikes:
"[Gavin's counsel]: Judge, I hope I haven't missed a window of opportunity here, but I was waiting for you to ask me regarding the jury selection as a whole. We wish to make a Batson objection to the striking of the three black jurors that were struck by the State, that would be juror number 42, number ÔÇö I'm sorry, number 46, number 59, and number 90. I was waiting for the opportunity to do that, and I apologize if I've missed that window.
"THE COURT: I think you've missed it. I think it's pretty clear that once the jury is empaneled and sworn that such an objection comes too late. Having said that, nevertheless, if you care to state for the record your grounds for that objection, I would be glad for you to do that.
"[Gavin's counsel]: Well, I believe it is incumbent upon the State under the circumstances to establish race-neutral reasons for striking those three jurors and the circumstances that we have here and that is basically my position. None *948 of those folks were the subject of challenges for cause, the State has exercised its peremptory challenges against three of the only six black members of the panel and we would challenge those, we would challenge those strikes under ... Batson."
(R. 48159-82.) The trial court denied Gavin's Batson motion on two grounds: (1) that it had been waived because he had not made the motion until after the jury had been sworn, and (2) that he had failed to establish a prima facie case of racial discrimination. Both rulings were correct.
First, contrary to Gavin's contention, his Batson motion was untimely.[14] "To be timely, a Batson objection must be interposed before the jury is empaneled and sworn." DeFries v. State, 597 So.2d 742, 750 (Ala.Crim.App.1992).
"Generally, one making a Batson challenge to the composition of the jury must do so before the jury is sworn. Stegall v. State, 628 So.2d 1006, 1008 (Ala.Cr.App.1993). Additionally, a Batson challenge is untimely if it is made after the venire has been dismissed. McGregory v. Lloyd Wood Constr. Co., 736 So.2d 571, 577 (Ala.1999). A Batson challenge made after the unselected members of the venire have been released would create the difficulty of a great delay in drawing and summoning a new venire. McGruder v. State, 560 So.2d 1137, 1143 (Ala.Crim.App.1989)."
Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 175 (Ala.2000). In this case, Gavin's motion was not made until after the venire had been dismissed, the jury had been sworn, and the trial court had given its preliminary instructions to the jury. In addition, nothing in the record indicates that Gavin was prevented from making his Batson motion in a timely fashion. Therefore, the trial court's initial ruling that the motion was untimely was correct. Moreover, because Gavin's Batson motion was not timely, we may review the trial court's alternative ruling that Gavin failed to establish a prima facie case of racial discrimination only for plain error. See Rule 45A, Ala.R.App.P.
The record reflects that there were 67 people on the venire, 6 of whom were African-American. The State used 3 of its 20 peremptory strikes to remove African-Americans from the venire. Gavin argues that the State's removal of 3 African-Americans constituted a prima facie case of racial discrimination because, he says, "[t]he percentage of the State's peremptory strikes employed against Africans was over twice their percentage in the venire panel, and over two and one-quarter times their percentage in the general population." (Gavin's brief at p. 82.) Gavin's argument is based solely on statistics. However, statistics alone are not sufficient to establish a prima facie case of racial discrimination.
In addressing a similar issue in Ex parte Trawick, 698 So.2d 162 (Ala.1997), the Alabama Supreme Court stated, in pertinent part:
"Trawick first argues that the State used its peremptory challenges to discriminate against female jurors, in violation of J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and that the trial court erred by not *949 requiring the State to articulate its reasons for its strikes of females. He points out that the State used 11 of its 14 peremptory strikes to remove women from Trawick's jury, resulting in a petit jury that was composed of 7 men and 5 women....
"... A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.
"At trial, Trawick objected to the State's peremptory strikes, but objected solely on the basis of race, not gender. Trawick has offered no evidence that the female veniremembers shared only the characteristics of gender, that anything in the type or manner of the prosecutor's statements or questions during the extensive voir dire indicated an intent to discriminate against female jurors, that there was a lack of meaningful voir dire directed at the female jurors, or that female jurors and male jurors were treated differently. He has offered no evidence that the prosecutor had a history of using peremptory challenges in a manner that discriminated against veniremembers of either gender. Instead, Trawick has merely emphasized that the State used many of its strikes to remove women from the venire. Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination."
698 So.2d at 167-68. See also Ex parte Pressley, 770 So.2d 143 (Ala.2000).
Similarly, here, Gavin has offered no evidence, nor has he alleged, that the African-American veniremembers struck by the State shared only the characteristics of race, that anything in the type or manner of the State's statements or questions during the voir dire examination indicated an intent to discriminate against African-American jurors, that there was a lack of meaningful voir dire directed at African-American jurors, that African-American jurors and Caucasian jurors were treated differently, or that the State had a history of using peremptory challenges in a manner that discriminated against African-American veniremembers. Rather, Gavin *950 offers only statistics regarding the number and percentage of strikes used by the State to remove African-American jurors from the venire. "[W]hile such statistical evidence can play a role in establishing a prima facie case, that type of evidence alone cannot support a prima facie case." Armstrong v. State, 710 So.2d 531, 534 (Ala.Crim.App.1997). Based on our review of the record, the trial court did not err in denying Gavin's Batson motion.

VII.
Gavin contends that the trial court erred in allowing certain testimony and in admitting certain pieces of evidence during both the guilt-phase and the penalty-phase of his trial. (Issues VII, VIII, and IX in Gavin's brief.) We address each of Gavin's claims in turn.

A.
Gavin contends that the trial court erred in permitting the State to introduce evidence indicating that he had previously been convicted of murder because, he says, the prior conviction was improper evidence of his bad character. During the guilt-phase of the trial, the State introduced into evidence a certified copy of a statement of conviction indicating that on June 9, 1982, Gavin had been convicted of murder in Cook County, Illinois. The State also presented testimony from Severia Morris, a parole supervisor with the Illinois Department of Corrections, regarding Gavin's prior conviction. Gavin did not object to the admission of the statement of conviction or to Morris's testimony; therefore, we may review this issue only for plain error. See Rule 45A, Ala.R.App.P.
Gavin was charged under  13A-5-40(a)(13), Ala.Code 1975, with murder made capital because he had been convicted of murder in the 20 years preceding the present crime. Count II of the capital indictment specifically charged:
"The grand jury of said county and state further charges that before the finding of this indictment, Keith Edmund Gavin, whose name to the grand jury is otherwise unknown than as stated, did intentionally cause the death of another person, William Clinton Clayton, Junior, by shooting him with a pistol, after having been convicted of murder on to-wit: June 9, 1982, in the Circuit Court of Cook County, Illinois, in violation of Section 13A-5-40(a)(13) of the Code of Alabama, contrary to law and against the peace and dignity of the State of Alabama"
(C. 10.) Gavin's 1982 murder conviction was an element of the capital offense that the State was required to prove beyond a reasonable doubt; therefore, evidence of that conviction was properly admitted. See, e.g., Ex parte Arthur, 472 So.2d 665, 667 (Ala.1985); Peraita v. State, [Ms. CR-01-0289, May 30, 2003] ___ So.2d ___ (Ala.Crim.App.2003); and Cosby v. State, 627 So.2d 1059 (Ala.Crim.App.1993). Moreover, we note that the trial court gave the jury the following limiting instruction regarding the prior conviction:
"During the trial, you heard evidence concerning whether the defendant, Mr. Gavin, had previously been convicted of murder. The one and only reason you were permitted to hear that evidence is that one of the elements of the capital offense is a conviction of murder within 20 years immediately preceding the murder alleged in this case. This is the only reason evidence about whether the defendant has previously been convicted of murder was admitted, and that is the only purpose for which you may consider it. You are not to consider the evidence that Mr. Gavin may have been convicted of murder on a previous occasion *951 as evidence that he committed the alleged murder with which he is charged in this case."
(R. 1194-95.) We find no error, plain or otherwise, as to this claim.

B.
Gavin also contends that the trial court erred in admitting evidence of his 1982 murder conviction and evidence of a 1979 burglary conviction because, he says, there was no showing that he had been represented by counsel for either of those convictions. Because Gavin did not object to the admission of these prior convictions on this ground at trial, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
As noted above, during the guilt-phase of the trial, the State introduced into evidence a certified copy of a statement of conviction indicating that Gavin had been convicted of murder in 1982 in Cook County, Illinois. The certified copy stated, in part:
"On May 4, 1981, the above named defendant, while represented by counsel, was duly arraigned before the Honorable Richard J. Fitzgerald of the Circuit Court of Cook County and entered a plea of not guilty to the offense.
"... A jury was impanelled and thereafter returned against the defendant who was represented by counsel, a verdict of guilty of murder on June 9, 1982."
(C. 102.)(Emphasis added.) During the sentencing hearing before the trial court, the State also introduced into evidence a certified copy of a statement of conviction indicating that Gavin had also been convicted of burglary in 1979 in Cook County, Illinois.[15] The certified copy of the burglary conviction stated, in part:
"On October 25, 1979, the above named defendant, while represented by counsel, was duly arraigned before the Honorable David J. Fields of the Circuit Court of Cook County and entered a plea of not guilty to the offense.
"... The defendant, after having been fully advised of his rights, and while represented by counsel, entered a plea of guilty to burglary on October 25, 1979."
(C. 180.)(Emphasis added.)
It is well settled that "[a]n uncounseled prior conviction cannot be used to support a finding of guilt or to enhance punishment." Ex parte Reese, 620 So.2d 579, 580 (Ala.1993). "The State bears `the burden of proving a valid prior conviction in which appellant was either represented by counsel or waived same.'" Reynolds v. State, 615 So.2d 94, 97 (Ala.Crim.App.1992), quoting Meadows v. State, 473 So.2d 582, 588 (Ala.Crim.App.1985). In Jackson v. State, 502 So.2d 858, 865 (Ala.Crim.App.1986), this Court held that, where documents pertaining to a prior conviction showed that the appellant had been represented by counsel at arraignment and at the entry of his plea, a presumption arose that he was represented by his counsel during the entire proceedings and the burden shifted to the appellant to prove otherwise. See also Shepard v. State, 539 So.2d 449, 450 (Ala.Crim.App.1988)("Because the record clearly shows that the appellant was represented by counsel when he made his motion to enter a guilty plea, there is a presumption that he was represented by counsel during the entire proceedings and it is his burden to prove otherwise.").
*952 In this case, the record affirmatively shows that Gavin was represented by counsel in both of his prior convictions both at arraignment and at the time of the convictions. Thus, there is a presumption that he was represented by counsel throughout the entire proceedings, and Gavin has failed to rebut that presumption. Therefore, we find no error, much less plain error, in the admission of Gavin's prior convictions.

C.
Gavin contends that the trial court erred in admitting into evidence at the sentencing phase of his trial a document entitled "Official Statement of Facts" which sets forth the facts surrounding his prior murder conviction. He argues that the document was inadmissible hearsay that did not fall within any exception to the hearsay rule and that violated his right to confrontation. Gavin did not object to the admission of the document on the ground that it violated his right to confrontation; therefore, we review that claim only for plain error. See Rule 45A, Ala.R.App.P.
After the jury returned its guilt-phase verdicts, but before the sentencing phase of the trial began, the court held a hearing outside the presence of the jury regarding the "Official Statement of Facts." The court ruled that the last paragraph of the statement would have to be redacted,[16] but that the remainder of the document would be admissible pursuant to  13A-5-45(d), Ala.Code 1975, as relevant to sentencing, and that Gavin, who had been provided with the statement after the jury's guilt-phase verdicts, which were returned on Saturday before sentencing was to begin on Monday, had a fair opportunity to rebut the facts in the document.[17]
During the sentencing hearing, the State called Severia Morris, an Illinois parole supervisor, to testify. During her testimony, she identified State's Exhibit 42, the redacted version of the "Official Statement of Facts" that was part of Gavin's parole file. Through questioning, the prosecutor attempted to lay a predicate for admission of the document under the business-records exception to the hearsay rule.[18] After questioning Morris about the document on voir dire, Gavin objected to admission of the document on three grounds. He argued that it was hearsay and that the State had failed to lay the proper predicate for admission of the document under the business-records exception to the hearsay rule. He also argued that the document was inadmissible under  13A-5-45(d), *953 Ala.Code 1975, which, he said, should be strictly construed in his favor to prevent admission of the document because, according to Gavin, "the defense has not had the opportunity to properly rebut this document, we did not have access to the record of trial which is the only official source of facts from which that document could have been prepared, that we were given investigation only and not the official record of trial in determination of the facts." (R. 1234.) Finally, he argued that the document was irrelevant and was more prejudicial than probative because, he said, both aggravating circumstances relating to the prior conviction ÔÇö that he was on parole at the time of Clayton's murder, see  13A-5-49(1), Ala.Code 1975, and that he had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, see  13A-5-49(2), Ala.Code 1975 ÔÇö had been proven beyond a reasonable doubt by virtue of the guilt-phase verdict finding him guilty of capital murder pursuant to  13A-5-40(a)(13), Ala.Code 1975. The trial court overruled Gavin's objections and admitted the document.
The document, signed by an assistant state attorney in Illinois, states the following regarding the prior conviction:
"Defendant and victim were attending a party at 1351 S. Troop Street when they got into a verbal argument. Defendant forced victim out of the party at gunpoint. He led victim down the street while hitting him and poking him with the gun. Victim begged for his life as defendant led him to secluded area behind a building located at 1416 S. Blue Island. Defendant then pulled out a gun and shot victim between the eyes. Victim died as a result of this gunshot wound which penetrated his brain. Three bullet fragments were recovered from the victim's skull. Defendant was arrested a short time later at 1432 S. Blue Island where he was sleeping."
(C. 144.)
"At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in Sections 13A-5-49, 13A-5-51, and 13A-5-52."  13A-5-45(c), Ala.Code 1975. Section 13A-5-45(d), Ala.Code 1975, specifically provides:
"(d) Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama."
(Emphasis added.)
After reviewing the record, we conclude that the "Official Statement of Facts" was properly admitted under  13A-5-45(d). The document had probative value and was relevant to sentencing. As noted above, with respect to the prior conviction, the State pursued two aggravating circumstances ÔÇö that Gavin was on parole at the time of Clayton's murder and that Gavin had previously been convicted of a capital offense or a felony involving the use or threat of violence to the person. The facts surrounding Gavin's prior murder conviction were relevant and probative and properly admitted to show the violent nature of the prior offense. See Dill v. State, 600 So.2d 343, 364 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992)(holding that hearsay evidence of the circumstances surrounding the defendant's prior robbery conviction "was properly admitted to show *954 the violent nature of the offense"); Siebert v. State, 562 So.2d 586, 598 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990)(holding that "testimony regarding the violence of the appellant's prior manslaughter offense was relevant and of probative value in the sentencing aspect of the trial"); and Johnson v. State, 399 So.2d 859, 864 (Ala.Crim.App.1979), aff'd in pertinent part, rev'd on other grounds, 399 So.2d 873 (Ala.1979)(holding that hearsay evidence "[t]hat the defendant had been involved in a prior robbery where great violence had been perpetrated against the victim" was properly admitted under  13-11-3, Ala.Code 1975, the predecessor to  13A-5-45(c) and (d), Ala.Code 1975, as probative and relevant to the sentencing determination).
Moreover, we conclude, as did the trial court, that Gavin was provided a fair opportunity to rebut the facts in the document. Gavin stated at trial that he did not have access to the "official record" from his previous conviction, but that he had "investigation only." (R. 1234.) We do not believe that Gavin's not having the official record of his previous trial denied him a fair opportunity to rebut the facts of the document; his reference to "investigation only" indicates that he had at least some information from the investigation of the prior murder. In addition, in addressing a similar claim regarding the opportunity to rebut hearsay evidence in Ex parte Dunaway, 746 So.2d 1042 (Ala.1999), four Justices on the Alabama Supreme Court noted that "[a]lthough he had a constitutional right not to do so, Dunaway, in an effort to rebut the [hearsay] testimony of the State's witnesses..., could have testified during the sentencing phase, as he chose to do during the guilt phase."[19] 746 So.2d at 1048. Although Gavin did not testify at the guilt phase of his trial, as the appellant did in Ex parte Dunaway, he nevertheless could have testified at the sentencing phase in an effort to rebut the facts regarding the prior murder. Therefore, we find that Gavin was afforded a fair opportunity to rebut the facts in the document as required by  13A-5-45(d).
Further, we find no violation of Gavin's right to due process and confrontation.
"`The Confrontation Clause, found in the Sixth Amendment to the United States Constitution, provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The United States Supreme Court "has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial and that `a primary interest secured by [the provision] is the right of cross-examination.'" Ohio v. Roberts, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), quoting Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965)(footnote omitted). This Court has previously held that "evidence which would normally be admissible under an exception to the hearsay rule may still be inadmissible because it violates the confrontation clause of the Sixth Amendment." Grantham v. State, 580 So.2d 53, 55 (Ala.Crim.App.1991).
"`"`In Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court "announced that confrontation clause analysis should proceed case-by-case under a two-track approach that tests *955 the necessity and reliability of the contested testimony." United States v. Perez, 658 F.2d 654 at 660 (9th Cir.1981)(citing Roberts, 448 U.S. at 65-66, 100 S.Ct. at 2538-2539). The first consideration is the "rule of necessity" established by the sixth amendment. Roberts, 448 U.S. at 65, 100 S.Ct. at 2538. "In the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." Id. This necessity requirement is not "absolute." Perez, 658 F.2d at 661. The government is not required to produce a seemingly available witness when the "utility of trial confrontation [is] remote." Roberts, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. Furthermore, "testimony that is neither `crucial' to the prosecution nor `devastating' to the defendant might not be subject to the necessity requirement." Perez, 658 F.2d at 661 (citing Dutton v. Evans, 400 U.S. 74 at 87, 89, 91 S.Ct. 210 at 219, 220, 27 L.Ed.2d 213 (1970)). If the government establishes the unavailability of the witness, Roberts then requires that the declarant's statement bear adequate "indicia of reliability." Roberts, 448 U.S. at 66, 100 S.Ct. at 2539.'"
"`Grantham, 580 So.2d at 55-56 (quoting United States v. McClintock, 748 F.2d 1278, 1291-92 (9th Cir.1984), cert. denied, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985)).'
"Barnes v. State, 704 So.2d 487, 494-95 (Ala.Crim.App.1997)."
McNabb v. State, 887 So.2d 929, 968-69 (Ala.Crim.App.2001).
"`Courts are permitted to consider hearsay testimony at sentencing.... While hearsay evidence may be considered in sentencing, due process requires both that the defendant be given an opportunity to refute it and that it bear minimal indicia of reliability....'"
"[Ex parte McGahee,] 632 So.2d [981,] 982-83 [(Ala.1993)]. Reliability can be established in either of two ways: 1) by demonstrating that the hearsay statement falls within a firmly rooted hearsay exception, or 2) by demonstrating that the statement is supported by a showing of particularized guarantees of trustworthiness. See Fortner v. State, 582 So.2d 581 (Ala.Crim.App.1990); see, also, Charles W. Gamble, McElroy's Alabama Evidence  242.01(7) (5th ed.1996), and the cases cited therein."
Ex parte Dunaway, 746 So.2d at 1047-48.[20]
Although the State did not demonstrate that the assistant state attorney who made the document was unavailable, we find that doing so was not required in this case because the utility of trial confrontation was remote. In addition, we find that the document had a minimal indicia of reliability.
With respect to reliability, the State argues that the document was reliable because it fell within the business-records exception to the hearsay rule. See Rule 803(6), Ala.R.Evid. (which provides that "[a] memorandum, report, record, or data compilation, in any form, of acts, *956 events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness" is admissible as an exception to the hearsay rule). Although we do not discount the possibility that the document could constitute a business record under Rule 803(6), after reviewing the record in this case we find that the State failed to lay the proper predicate for its admission as a business record. As noted above, the State introduced the document through the testimony of Morris, the Illinois parole supervisor who kept a copy of the document in her records. The document, however, was not made by Morris, it was made by an assistant state attorney. Although the document was retained, and probably relied on, by Morris in the regular course of her business activity, neither of these occurrences is sufficient to make the document Morris's business record under Rule 803(6). It is clear from the testimony that if the document constituted a business record, it was the assistant state attorney's business record, not Morris's business record; therefore, Morris could not lay the predicate for admission of the document under the business-records exception to the hearsay rule. See Mayo v. City of Rainbow City, 642 So.2d 524 (Ala.Crim.App.1994).
In addition, we find that the document did not fall within the public-records exception to the hearsay rule. See Rule 803(8), Ala.R.Evid. (which provides, in part, that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... the activities of the office or agency, or ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, when offered against the defendant in criminal cases, matters observed by police officers and other law enforcement personnel" are admissible as an exception to the hearsay rule). The facts and circumstances surrounding the murder in Illinois do not constitute the "activities of the" Illinois state attorney's office. In addition, the crime was not "observed" by the assistant state attorney who made the statement of facts; therefore, although, as noted below, the assistant state's attorney had a duty imposed by law to write the statement of facts, the facts of the crime would not constitute "matters observed pursuant to duty imposed by law."[21]
Although, based on the record, the document does not fall within any of the exceptions to the hearsay rule, we nevertheless find that it bears indicia of reliability because it has particularized guarantees of trustworthiness. As noted above, the document was prepared by an assistant state attorney, an officer of the court. In addition, it was prepared pursuant to a duty imposed by Illinois law. See 730 Ill. Comp. Stat. Ann. 5/5-4-1(d) (2003)(which provides, in part, that "[w]hen the defendant is committed to the Department of Corrections, the State's attorney shall and counsel for the defendant may file a statement with the clerk of the court to be transmitted to the department, agency, or institution to which the defendant is committed to furnish such department, agency or institution with the facts and circumstances *957 of the offense for which the person was committed"). Because the maker of the document was an officer of the court who was under a duty imposed by law to make the document, we believe there was incentive for the statement to be accurate. Therefore, we conclude that the admission of the "Official Statement of Facts" did not violate Gavin's right to confrontation.
Accordingly, the "Official Statement of Facts" regarding Gavin's prior murder conviction was properly admitted into evidence at the sentencing phase of the trial.

D.
Gavin contends that the trial court erred in allowing the State to introduce into evidence during the guilt-phase of his trial a mug shot of him that had been taken in connection with his 1982 Illinois murder conviction. He maintains that the State failed to meet the three requirements for admission of mug shots as set forth in Ex parte Long, 600 So.2d 982 (Ala.1992), and that the mug shot was highly prejudicial in that it "portray[ed him] as a `bad' or `dangerous' person." (Gavin's brief at p. 93.)
During the testimony of Severia Morris, the Illinois Department of Corrections parole supervisor, the State asked if Morris had a photograph in her file of the "Keith Gavin" who had been convicted of murder in Illinois in 1982; she said that she did, and Gavin objected to admission of the photograph. The trial court overruled Gavin's objection and admitted the photograph into evidence. The photograph was a typical mug shot with juxtaposed frontal and profile views and a placard depicting a number and stating "Illinois Department of Corrections"; information below the photograph indicated that it had been taken at the "East Moline Correctional Facility" and included not only Gavin's name and physical characteristics, but also that he had been convicted of "murder" and sentenced to "34 yrs." (C. 142.)
"While mug shots are generally inadmissible in a criminal trial because the jury may infer the defendant has a criminal history, under certain circumstances, admitting a mug shot into evidence does not constitute reversible error." Holland v. State, 654 So.2d 77, 82 (Ala.Crim.App.1994). In Ex parte Long, the Alabama Supreme Court adopted the three prerequisites set forth in United States v. Harrington, 490 F.2d 487 (2d. Cir.1973), for determining the admissibility of a mug shot; those prerequisites are: (1) the State must have a demonstrable need for the mug shot; (2) the mug shot must not itself imply to the jury that the defendant has a prior criminal record; and (3) the manner of introduction of the mug shot must not draw particular attention to the source and implication of the mug shot. However, as the Supreme Court noted in Ex parte Long,"the failure to meet one or more of these criteria would not necessarily result in reversible error." 600 So.2d at 989.
In this case, we cannot say that the State had a demonstrable need to introduce the mug shot. We recognize that the State was required to prove, as an element of the capital offense, that Gavin had been convicted of murder within 20 years preceding the present murder, and that, as part of that proof, the State had to present evidence that the "Keith Gavin" who had been convicted of murder in Illinois in 1982 was, in fact, the "Keith Edmund Gavin" who was on trial for capital murder. However, Morris positively identified Gavin at trial as the man who had been convicted of murder in Illinois in 1982 and released on parole in December 1997. Therefore, there was no need for the State to introduce into evidence the mug shot. In addition, the manner in which the mug shot *958 was introduced as well as the mug shot itself clearly showed that Gavin had previously been convicted of murder. Therefore, none of the prerequisites for introduction of the mug shot were met.
However, because the State was required to prove, as an element of the capital offense, that Gavin had been convicted of murder in the 20 years preceding the present murder, and as noted in Part VII.A. of this opinion, evidence of Gavin's prior murder conviction was, in fact, properly admitted during the guilt-phase of the trial, the jury was well aware at the time the mug shot was introduced that Gavin had been convicted of murder in Illinois in 1982. Moreover, the mug shot was taken in connection with the 1982 murder conviction and did not otherwise indicate any other criminal history on Gavin's part. As this Court noted in addressing a similar issue in Webb v. State, 539 So.2d 343 (Ala.Crim.App.1987):
"Ordinarily, `mug shots' are inadmissible because they depict an accused in a manner which allows a jury to infer that the accused has a prior criminal record, Holsclaw v. State, 364 So.2d 378 (Ala.Cr.App.), cert. denied, Ex parte State ex rel. Attorney General, 364 So.2d 382 (Ala.1978). Yet, in an escape prosecution, the jury is already well aware of the fact that the accused was a prisoner with at least one prior conviction at the time of the alleged offense. Thus, the defendant was not prejudiced by the introduction of the `mug shot.'"
539 So.2d at 348. See also State v. Rackley, 128 N.M. 761, 998 P.2d 1212 (N.M.Ct.App.2000), and State v. Blankenship, 102 Ohio App.3d 534, 657 N.E.2d 559 (1995).
Given that the jury was already aware of Gavin's 1982 murder conviction at the time the mug shot was introduced, any error on the part of the trial court in admitting the mug shot into evidence was not prejudicial to Gavin, but was harmless beyond a reasonable doubt.

E.
Gavin contends that the trial court erred in overruling his objection and allowing Investigator Danny Smith to identify him at trial because, he says, Investigator Smith's identification was tainted by an impermissibly suggestive one-man showup that occurred on the night of the crimes.
At trial, Investigator Smith testified that he was present during most of the search for Gavin on the night of March 6, 1998, but that at approximately 9:30 p.m., he returned to his office briefly. Investigator Smith stated that when he was en route back to the search area at about 10:30 p.m., he was informed that a suspect had been taken into custody, and he instructed the officers who were transporting the suspect to the jail to meet him in Leesburg so that he could "look at the suspect that they had in custody to make sure that they, in fact, had the right person." (R. 570.) Over objection,[22] Investigator Smith testified that the officers met him as directed and that he identified the person in the back of the patrol car as the person who had been driving the van and who had shot at him. At trial, he positively identified Gavin as the person who had been driving the van, who had fired at him, and who he had seen in the back of the patrol car.
"`The United States Supreme Court has long recognized that the practice of showing a suspect singly *959 for purposes of identification "has been widely condemned" as being unnecessarily suggestive and conducive to irreparable mistaken identifications that constitute a denial of due process. Manson v. Brathwaite, 432 U.S. 98, 104, 97 S.Ct. 2243, 2248, 53 L.Ed.2d 140, 147 (1977)(quoting Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967)). In United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court sharply criticized suggestive pretrial identifications, such as one-man showups, calling them "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification":
"`"....
"`The danger inherent in a one-man showup, where a witness is shown a single suspect and asked, "Is that the man?" is twofold. First, a one-man showup conveys a clear message that "the police suspect this man." Williams v. State, 546 So.2d 705, 706 (Ala.Crim.App.1989)(quoting Biggers v. Tennessee, 390 U.S. 404, 407, 88 S.Ct. 979, 981, 19 L.Ed.2d 1267, 1269 (1968)(Douglas, J., dissenting)(emphasis in original)). Second, a one-man showup does not give the witness a choice of identifying any other person as being the perpetrator of the crime charged. See Brazell v. State, 369 So.2d 25 (Ala.Crim.App.1978), cert. denied, 369 So.2d 31 (Ala.1979). Consequently, when a one-man showup is used to identify the perpetrator of a crime, the reliability of the witness's identification is not put to an objective test, such as a live or photographic lineup, in which a single suspect must be chosen from a group of persons possessing similar physical characteristics.'"
"Ex parte Frazier, 729 So.2d 253, 254-55 (Ala.1998)(some emphasis in original; some emphasis added [in Appleton]). Although a one-man showup is inherently dangerous, `it is permitted where conducted promptly after the commission of a crime or demanded by necessity, emergency or exigent circumstances.' Brazell v. State, 369 So.2d 25, 29 (Ala.Crim.App.1978), cert. denied, 369 So.2d 31 (Ala.1979)."
`In determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony, the central question is whether, under the totality of the circumstances, the identification was reliable. Manson [v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)]. This determination involves the application of a two-pronged test.'
"`"[T]he required inquiry is two-pronged. The first question is whether the initial identification procedure was `unnecessarily'... or `impermissibly' ... suggestive. If it is found to have been so, the court must then proceed to the question whether the procedure found to have been `unnecessarily' or `impermissibly' suggestive was so `conducive to irreparable mistaken identification' ... or had such a tendency `to give rise to a very substantial likelihood of irreparable misidentification'... that allowing the witness to make an in-court identification would be a denial of due process." United States ex rel. Phipps v. Follette, 428 F.2d 912, 914-15 (2d Cir.1970).'"

Brazell v. State, 369 So.2d at 28-29 (emphasis added [in Appleton]). See also Donahoo v. State, 371 So.2d 68, 72 (Ala.Crim.App.1979). In evaluating the *960 likelihood of misidentification, the court must consider the following factors:
"`[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness's degree of attention, [3] the accuracy of the witness's prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.'
"Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972)(emphasis added [in Appleton]). See also Ex parte Frazier, supra."
Ex parte Appleton, 828 So.2d 894, 899-900 (Ala.2001).
Gavin argues that the identification procedure in this case was unnecessarily and impermissibly suggestive merely because it was a one-man showup. Although a one-man showup is inherently suggestive, "it does not necessarily follow that the procedure [is] unduly suggestive so that it would taint [a] subsequent in-court identification." Quarles v. State, 711 So.2d 1115, 1117 (Ala.Crim.App.1997). See also Nichols v. State, 624 So.2d 1328, 1338 (Ala.Crim.App.1992)(although one-man showups "are by their nature suggestive, they are not necessarily unduly so"), and Cooley v. State, 439 So.2d 193, 195 (Ala.Crim.App.1983)("the mere fact that the appellant was subjected to a one-man showup does not necessarily render that identification procedure impermissibly suggestive"). As this Court noted in O'Dell v. State, 482 So.2d 1341 (Ala.Crim.App.1985):
"`[I]t is settled law that prompt, on-the-scene confrontations are not constitutionally impermissible, but are consistent with good police work.' (Citations omitted.) Hobbs v. State, 401 So.2d 276, 279 (Ala.Cr.App.1981). A prompt on-the-scene identification of a suspect increases the reliability of the identification under the following rationale:
"`[T]he police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh.' Id. at 280, quoting Bates v. United States, 405 F.2d 1104 (D.C.Cir.1968)."
482 So.2d at 1346.
We find that the showup in this case was not unnecessarily and impermissibly suggestive. Investigator Smith, a trained law-enforcement officer, requested that the officers transporting Gavin to the jail meet him in Leesburg so that he could "look at the suspect that they had in custody to make sure that they, in fact, had the right person." (R. 570.) It is clear from Investigator Smith's testimony that his identification of Gavin in the patrol car was not based on any preconceived notion that the person the police had in custody was, in fact, the person who had shot at him, but rather, was a precautionary measure to ensure that the right man was in custody so that the manhunt that had been going on for a little over three hours could be called off. See, e.g., Davis v. State, 216 Ga.App. 580, 581, 455 S.E.2d 115, 116 (1995)("It is recognized that any psychological effect a one-on-one showup may have on a potential witness is greatly diminished when that witness is a law enforcement officer who, through experience, training or both, has learned certain witness identification techniques and procedures."), and People v. Cinatus, 200 A.D.2d 754, 754, 607 N.Y.S.2d 363, 364 *961 (1994)(holding "that the witness was a police officer is relevant in determining whether or not the identification procedure employed was unduly suggestive"). Under these circumstances, we find that the one-man showup was not unnecessarily or impermissibly suggestive.
However, even assuming that the showup was unnecessarily and impermissibly suggestive (which we hold it was not), it was not so "`"`conducive to irreparable mistaken identification'... or had such a tendency `to give rise to a very substantial likelihood of irreparable misidentification' ... that allowing the witness to make an in-court identification would be a denial of due process."'" Ex parte Appleton, 828 So.2d at 900, quoting Brazell v. State, 369 So.2d 25, 29 (Ala.Crim.App.1978). Applying the five factors set forth in Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), we conclude that the likelihood of misidentification in this case was low.
First, Investigator Smith had ample opportunity to view Gavin at the time of the crime. Investigator Smith testified that although it was dark and it had begun raining, when Gavin shot at him the first time, while standing in the middle of the road, Gavin was illuminated by the headlights from Investigator Smith's vehicle and from the headlights of oncoming traffic. In addition, according to Investigator Smith, when Gavin first got out of the van, he took the time to aim before firing at Investigator Smith.
Second, Investigator Smith's degree of attention at the time of the crime was clearly high as he was a trained law-enforcement officer. As noted by the United States Supreme Court in addressing a similar issue in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977):
"[A]s a specially trained, assigned, and experienced officer, he could be expected to pay scrupulous attention to detail, for he knew that subsequently he would have to find and arrest [the suspect]. In addition, he knew that his claimed observations would be subject later to close scrutiny and examination at any trial."
432 U.S. at 115, 97 S.Ct. 2243. See also People v. Rupert, 192 A.D.2d 1072, 1073, 595 N.Y.S.2d 998, 999 (1993)("[T]he danger of misidentification was greatly reduced because this confirmatory identification was made by police officers who are trained to be both accurate and objective.").
Third, the record reflects that after Gavin fled into the woods, Investigator Smith provided a description of him to other law-enforcement personnel. Investigator Smith testified that he described Gavin as a black male, wearing a maroon or wine-colored shirt, blue jeans, and some type of toboggan cap or other cap on his head. When Gavin was found, he was wearing blue jeans and a wine-colored shirt; although he was not wearing a toboggan cap, a toboggan cap was found at a point near where Gavin had entered the woods. We recognize that as part of his initial description, Investigator Smith also stated that based on the "thickness" of the gun as he saw it, he believed, but "wasn't sure" (R. 604), that Gavin had a revolver when, in fact, the weapon found was a .40 caliber semiautomatic Glock pistol; however, we do not believe this discrepancy undermines Investigator Smith's otherwise accurate description of Gavin.
Fourth, Investigator Smith testified that when he saw Gavin in the patrol car later that evening, he was positive that the right man was in custody. He also positively identified Gavin at trial. And finally, only *962 a little over three hours had elapsed between the crime and the identification.
Under the circumstances, we conclude that the trial court did not err in allowing Investigator Smith's identification testimony.[23]

F.
Gavin contends that the trial court erred in allowing the State to introduce into evidence, over his objection, a photograph of the murder weapon. According to Gavin, "[t]he effect of the trial court's failure to sustain the timely objection of the defendant was to allow prejudicial evidence to `pile up' on the jury table, and to simultaneously deprive the defendant of the right to have the entire pistol made subject to cross-examination." (Gavin's brief at p. 99.)
The record reflects that on the first day that testimony was presented (the third day of trial), the State called Dewayne Meeks to testify. During his testimony, Meeks was asked if he could identify State's Exhibit 8, a photograph of the murder weapon. After one objection and two off-the-record bench conferences, the trial court allowed Meeks to testify about the photograph. Meeks then identified the gun in the photograph as the gun that had been issued to him by the Illinois Department of Corrections. At the conclusion of Meeks's testimony, the State offered the photograph as evidence, explaining that the reason it was using the photograph at that time was because the gun itself was still in the possession of a ballistics expert and not in the courtroom. The trial court admitted the photograph into evidence, contingent upon the State's later authenticating the photograph through the testimony of Investigator Smith (who had taken the photograph) and the State's later introducing the actual gun into evidence. The record reflects that the State properly authenticated the photograph through the testimony of Investigator Smith and that it did introduce into evidence the actual gun during the testimony of Mitch Rector, a firearms examiner with the Alabama Department of Forensic Sciences.
"The test for determining admissibility of a photograph is whether it is a true and accurate representation of the subject which it purports to represent, as it existed at the time pertinent to inquiry. Elmore v. State, 414 So.2d 175 (Ala.Cr.App.1982); Osborn v. Brown, 361 So.2d 82 (Ala.1978).
"....
"Generally, photographs are admissible if they are verified by a person familiar with the subject matter of the photograph and if they are relevant to some disputed or material issue, illustrate or elucidate some other relevant fact or evidence, or corroborate or contradict some other evidence offered. Photographs may also be admitted if they have some tendency to shed light on, strengthen, or illustrate other testimony in the case. Donner v. State, 409 So.2d 461 (Ala.Cr.App.1981)."
Mitchell v. State, 450 So.2d 181, 184-185 (Ala.Crim.App.1984). "The admissibility of photographs lies within the trial court's discretion and will be reviewed only to *963 determine whether there has been an abuse of that discretion." Samuels v. State, 584 So.2d 958, 959 (Ala.Crim.App.1991).
The photograph of the murder weapon was properly admitted into evidence. The murder weapon was, of course, highly relevant to the trial. The photograph of the murder weapon was used so that Meeks, who had traveled from Illinois to testify, could identify the gun, which was still in the possession of the ballistics expert and not available for trial at that point in time. In addition, the photograph was properly authenticated, and the murder weapon itself was later introduced into evidence. Therefore, the trial court did not abuse its discretion in admitting the photograph of the murder weapon.[24]

G.
Gavin contends that the trial court erred in admitting into evidence, over his objection, the toboggan cap found near the woods into which he fled after shooting at Investigator Smith because, he says, it was irrelevant to any issue in the case and was highly prejudicial.
Jimmy Deberry, a deputy with the Cherokee County Sheriff's Department, testified that he participated in the search for Gavin on the night of March 6, 1998, and that he assisted in the search for, and the collection of, evidence in the area after Gavin's arrest. Deputy Deberry stated that at approximately 11:00 p.m. that evening he found a black and red toboggan cap near the point where Gavin had entered the woods when he fled after shooting at Investigator Smith. Before the State offered the toboggan cap as evidence, Gavin objected on the ground of relevance. Specifically, Gavin argued to the trial court that no evidence had been presented indicating that Gavin had been wearing a toboggan cap at the time of the crimes and that, therefore, the toboggan cap was irrelevant to any issue in the case. The trial court overruled Gavin's objection.
"The admission or exclusion of evidence is a matter within the sound discretion of the trial court." Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). "The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). In addition, "[t]rial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent plain error or an abuse of discretion." Hayes v. State, 717 So.2d 30, 36 (Ala.Crim.App.1997).
Rule 402, Ala.R.Evid., provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State." Rule 401, Ala.R.Evid. defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Alabama recognizes a liberal test of relevancy, which states that evidence is admissible `if it has *964 any tendency to lead in logic to make the existence of the fact for which it is offered more or less probable than it would be without the evidence.'" Hayes, 717 So.2d at 36, quoting C. Gamble, Gamble's Alabama Evidence  401(b). "[A] fact is admissible against a relevancy challenge if it has any probative value, however[ ] slight, upon a matter in the case." Knotts v. State, 686 So.2d 431, 468 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996). Relevant evidence should be excluded only "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, Ala.R.Evid. "The general rule is that articles which are properly identified and which tend to show the commission of the crime or the manner in which it was committed or elucidate some matter in issue are admissible in evidence for inspection and observation by the jury." Beasley v. State, 408 So.2d 173, 179 (Ala.Crim.App.1981).
Contrary to Gavin's contention, the toboggan cap was relevant to the case. Twilley, who positively identified Gavin as the person who had shot Clayton, testified that he remembered that, at one point during the shooting, Gavin was wearing something red and black on his head. Investigator Smith, who positively identified Gavin as the person who had shot at him, testified that Gavin had a toboggan cap or other type of cap on his head when he got out of the van. The toboggan cap introduced by the State was red and black and had been found near where Gavin had entered the woods when he fled after shooting at Investigator Smith. The toboggan cap linked the two crime scenes and supported the testimony of Twilley and Investigator Smith; it was, therefore, relevant. See, e.g., Arthur v. State, 711 So.2d 1031, 1046-47 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997). In addition, the prejudicial effect of the toboggan cap did not substantially outweigh its probative value. There was no error on the part of the trial court in admitting the toboggan cap into evidence.[25]

H.
Gavin contends that the trial court erred in admitting into evidence, over his objection, the motel-room key found in his pants pocket at the time of his arrest and testimony indicating that the key fit room 113 at the Super 8 Motel in Chattanooga, one of the rooms Meeks said he and Gavin had rented on the morning of March 6, 1998. Gavin's entire argument in this regard is as follows:
"The objection made at the time of this testimony was well taken. The issue with respect to the key, and testimony about it, is one of relevance. As defense counsel pointed out [in his objection], there was no predicate laid as to what sort of mathematical odds preexisted of the key working in that particular door. For all the trial court or jury knew, that key might have opened half the rooms in that motel. Such duplication is frequently done to save locksmith costs. Thus, without some additional predicate, which might have been minimal given the record, it was improper to allow the evidence. It is not enough that the key worked, and thereby failed to exclude the defendant's *965 connection to the room; it was necessary to provide an accurate foundation showing the extent to which the given fact (key worked) supported the intended inference (defendant linked to this room). Ala.R.Evid. 402"
(Gavin's brief at p. 102.)
Contrary to Gavin's contention, the State was not required to present evidence of the "mathematical odds" of the key fitting room 113 in the Super 8 Motel in Chattanooga as opposed to any other room in the motel for the key to be relevant and admissible. As noted previously, Alabama recognizes a liberal test of relevancy; evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Ala.R.Evid. The key was clearly relevant; it linked Gavin to the Super 8 Motel in Chattanooga and corroborated Meeks's testimony. Whether the key fit another room in that motel or in any other motel went to the weight of the evidence, not to its admissibility. The trial court did not err in admitting into evidence the motel room key found in Gavin's pants pocket after his arrest or the testimony indicating that the key fit room 113 in the Super 8 Motel in Chattanooga on the ground that the State did not establish a proper predicate.

I.
Gavin also contends that the trial court erred in admitting the motel-room key found in his pants pocket as well as the clothing he was wearing at the time of his arrest because, he says, he was arrested without probable cause. Gavin did not challenge the propriety of his arrest in the trial court; he did not move to suppress the motel-room key or his clothing on this ground at trial; and he did not object to the admission of the motel-room key or his clothing on this ground at trial. Therefore, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
"`Section 15-10-3[(a)](3), Ala.Code 1975, provides that an officer may arrest an individual without a warrant when a felony has been committed and he has reasonable cause to believe that the individual arrested committed the felony.' Sockwell v. State, 675 So.2d 4, 13 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). `[R]easonable cause has been equated with probable cause.' Daniels v. State, 534 So.2d 628, 651 (Ala.Crim.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987), opinion after remand, 534 So.2d 658 (Ala.Crim.App.1987), aff'd, 534 So.2d 664 (Ala.1988), cert. denied, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1989). "`The rule of reasonable or probable cause is a `practical, nontechnical conception,''" id., quoting Tice v. State, 386 So.2d 1180, 1183 (Ala.Crim.App.), cert. denied, 386 So.2d 1187 (Ala.1980), and `[t]he level of evidence needed for a finding of probable cause is low.' State v. Johnson, 682 So.2d 385, 387 (Ala.1996). `"`Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'"' State v. Johnson, 682 So.2d at 388, quoting Young v. State, 372 So.2d 409, 410 (Ala.Crim.App.1979), quoting, in turn, Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). Put another way, `[p]robable cause is knowledge of *966 circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty.' Sockwell, 675 So.2d at 13. "`An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest].... `Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.''" State v. Johnson, 682 So.2d at 387-88, quoting Stone v. State, 501 So.2d 562, 565 (Ala.Crim.App.1986), overruled on other grounds, Ex parte Boyd, 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989).
"`"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act...." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1891 (1949). "`The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" Id. "Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest." Cox v. State, 489 So.2d 612 (Ala.Cr.App.1985).'"
"Dixon v. State, 588 So.2d 903, 906 (Ala.1991). See also Minor v. State, 780 So.2d 707, 733 (Ala.Crim.App.1999), rev'd on other grounds, 780 So.2d 796 (Ala.2000); and McWhorter v. State, 781 So.2d 257, 288 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000). `In making the determination as to whether probable cause exists for a warrantless arrest, we must examine the totality of the circumstances surrounding the arrest.' Sockwell, 675 So.2d at 13, quoting Daniels, 534 So.2d at 651."
Reeves v. State, 807 So.2d 18, 35-36 (Ala.Crim.App.2000).
After examining the totality of the circumstances surrounding Gavin's arrest, we find that there was probable cause for the arrest. The evidence indicated that Investigator Smith followed a van matching the description of the van involved in the shooting in downtown Centre until it stopped in the middle of the road at the intersection of Highways 48 and 68. When the driver of the van got out of the vehicle, he fired two shots at Investigator Smith and then fled into a nearby wooded area. Within only a few minutes, other law-enforcement personnel arrived at the scene and formed a perimeter around the wooded area so that no one could leave the area without being seen. Investigator Smith described the suspect to other law-enforcement personnel as being black and wearing a maroon or wine-colored shirt, blue jeans, and some type of toboggan cap or other cap on his head; a lengthy search for the suspect then ensued. Tony Holladay was called in with his tracking dog, he was given a description of the suspect and informed about the circumstances, and the dog tracked a human trail from the point where Investigator Smith had stopped pursuing the suspect into the woods to a creek where Gavin, who was wearing a wine-colored shirt and blue jeans, was discovered standing waist-deep in the creek and hiding behind an overhanging bush. See, e.g., Fields v. State, 644 So.2d 1322, 1324 (Ala.Crim.App.1994)(probable cause existed for arrest of the defendant where defendant was found driving a vehicle and wearing clothes that matched the description given by the victim). When Gavin saw Holladay, he attempted to flee; he did not stop until Holladay fired a shot over his shoulder. See, e.g., Doggett v. State, *967 791 So.2d 1043, 1057-58 (Ala.Crim.App.2000)("It is well settled that flight at the approach of law-enforcement officers is a strong indicator of mens rea, which may serve as the basis for suspecting criminal activity."). These facts and circumstances were sufficient to "`lead a reasonable person of ordinary caution, acting impartially, to believe'" that Gavin was the driver of the van who had shot and killed Clayton and who had shot at Investigator Smith. Reeves, 807 So.2d at 35, quoting Sockwell v. State, 675 So.2d 4, 13 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995). There was probable cause to arrest the appellant; therefore, there was no error, plain or otherwise, in the admission of the motel-room key and Gavin's clothing confiscated as a result of the arrest.

J.
Gavin contends that the trial court erred in allowing Investigator Smith to testify regarding what he terms "blood-spatter analysis." (Gavin's brief at p. 94.) Specifically, Gavin contends that Investigator Smith's testimony was inadmissible because, he says (1) Investigator Smith was not qualified as an expert in blood-spatter analysis, and (2) the State failed to lay a predicate under either Frye v. United States, 293 F. 1013 (D.C.Cir.1923), or Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
One of the main points of contention during Gavin's trial was the absence of blood on Gavin's clothing when he was arrested. Gavin argued to the jury that the absence of blood proved that he could not have been the person who shot Clayton because, he said, the person who shot Clayton would have gotten blood on his clothing when he got in the driver's seat of the van and drove away. On the other hand, the State argued, and presented evidence indicating, that based on Clayton's size and position in the van at the time of the shooting, and the nature of the gunshot wounds, there was little or no blood on the driver's seat of the van immediately after the shooting for Gavin to get on his clothes when he drove the van from the scene. According to the State, the blood seen on the driver's seat in the photographs of the interior of the van that were introduced into evidence was transferred there by emergency personnel as they were removing Clayton from the van to transport him to the hospital. In the alternative, the State argued that any blood traces Gavin may have gotten on his clothing when he got in the van had been washed off when Gavin entered the creek in the woods while fleeing the police.
During its case-in-chief, the prosecutor questioned Investigator Smith about what he had seen when he went to the van and checked on the victim after Gavin had fled into the woods. The following occurred during direct examination:
"[Prosecutor]: Was Mr. Clayton bleeding?
"[Investigator Smith]: There was some blood in the van, not what I guess you would expect to see from two gunshot wounds, but there was, primarily the bleeding was between the seats to the right of the driver's seat, and then there was, it was over on the passenger's seat. Very little blood that we could see at that time on the driver's seat, on the driver's bucket seat.
"[Prosecutor]: You said there was very little blood on the driver's seat at that time?
"[Investigator Smith]: It would have been where Mr. Clayton was at and to his right because the gravity flow on the blood would be, you know, the seat down.

*968 "[Prosecutor]: Do you know or do you recall whether or not any blood was transferred onto the driver's seat in the process of taking Mr. Clayton out of the van?
"[Investigator Smith]: Yes, sir."
(R. 567.) During cross-examination, Gavin's counsel questioned Investigator Smith as follows:
"[Gavin's counsel]: ... You testified that when you arrived to render aid to Mr. Clayton that some blood, there was very little blood on the driver's side of the van; is that correct?
"[Investigator Smith]: That's correct.
"[Gavin's counsel]: But that blood was transferred by the moving of the body?
"[Investigator Smith]: During the process of the moving of the body there was blood transferred, yes, sir.
"[Gavin's counsel]: Okay. If someone had been sitting in the driver's side of the van, is it possible that blood from the driver's seat could have transferred to that person as well, and that could also account for the absence of blood, could it not?
"[Investigator Smith]: Are you talking about before or after we moved Mr. Clayton's body?
"[Gavin's counsel]: Well, if the person you testified jumped out of the driver's side and fired a shot at you and then exited into either woods or up the road, that person could easily have had blood which had been in the driver's seat, could have transferred to that person's clothing, could it not?
"[Investigator Smith]: No, sir.
"[Gavin's counsel]: And that could account for the absence of blood?
"[Investigator Smith]: No, sir.
"[Gavin's counsel]: Were you there?
"[Investigator Smith]: I was observing the vehicle, yes, sir.
"[Gavin's counsel]: But, I mean, you were not inside the vehicle with the driver?
"[Investigator Smith]: There was nothing to indicate ÔÇö
"....
"[Gavin's counsel]: I think my question was, isn't it possible that the absence, what you described as the absence of blood on the driver's seat at the time that you arrived at the site of the van to render aid to Mr. Clayton, could be accounted for by the fact that blood, if any, that was in the driver's seat had been soaked up partially in the clothing of the person, not Mr. Clayton, who had been driving the van, and who therefore was the person that took the shot at you, isn't that possible?
"[Investigator Smith]: The answer to that is no.
"[Gavin's counsel]: And I guess my follow-up question was you were not inside the vehicle with the driver or Mr. Clayton; isn't that correct?
"[Investigator Smith]: No, not at that time. No, sir."
(R. 604-07.) During redirect examination of Investigator Smith, the following then occurred:
"[Prosecutor]: And I'm a little intrigued. [Gavin's counsel] asked you a question concerning the possibility of soaking up blood and you said that was not possible, but he didn't follow up on that, so let me ask you, if you would, please, to elaborate on that. Why would that not be possible in this case?
"[Investigator Smith]: There was no ÔÇö
"[Gavin's counsel]: Judge, I'm going to object to that unless we've had some establishment of Mr. Smith's qualifications in that regard.

*969 "[Prosecutor]: Judge, he asked him. [Investigator Smith is] an EMT.
"THE COURT: I'm going to let him answer.
"[Investigator Smith]: Mr. Clayton, being the heavier of the two subjects, the blood flow coming from the body ran away from the area of the seat that Mr. Gavin would have been seated in, and there was not any blood present on the seat in the area that [Gavin] would have been occupying. Therefore, none could be transferred to his clothing."
(R. 610-11.)(Emphasis on portion complained of by Gavin.)
Despite Gavin's attempts to characterize Investigator Smith's testimony as expert scientific testimony on blood-spatter analysis, we agree with the State that his testimony was a lay opinion based on his personal knowledge and observations, not expert scientific testimony on blood-spatter analysis.
In general, blood-spatter analysis is the process of examining the size, location, and configuration of bloodstains at a crime scene and using the general characteristics of blood to determine the direction, angle, and speed of the blood before it impacts on a surface in order to recreate the circumstances of the crime. See generally Danny R. Veilleux, Annotation, Admissibility, in Criminal Prosecution, of Expert Opinion Evidence as to "Blood Spatter" Interpretation, 9 A.L.R.5th 369 (1993) and the cases cited therein. Blood-spatter analysis is typically used to determine the position of the victim and the assailant at the time of a crime. Investigator Smith's testimony was not based on blood-spatter analysis; he did not analyze the bloodstains in the van in order to determine the respective locations of Clayton and the assailant at the time of the shooting. Rather, he used the location of Clayton when Clayton was found as well as his knowledge about the shooting to form an opinion as to where the blood would have been as a result of the shooting.
The evidence showed that almost immediately after shooting Clayton, Gavin pushed Clayton toward the passenger side of the van, got in the driver's seat, and drove away. Investigator Smith testified that when the van stopped and he went to check on Clayton, he found Clayton, suffering from multiple gunshot wounds, lying across the front of the van. Specifically, Investigator Smith said that Clayton was lying on his right side; his right hip was on the inside edge of the driver's seat; his right shoulder was on the passenger seat; and his feet and legs were on the driver's side floorboard. Investigator Smith also testified that there was a good deal of blood on the floorboard between the two front seats. Given this evidence, it is clear that Investigator Smith's testimony that "the blood flow coming from the body ran away from the area of the seat that Mr. Gavin would have been seated in" was based on common sense, not on novel scientific blood-spatter analysis. Investigator Smith was not offered as an expert witness, and his testimony regarding the blood in the van was nothing more than a lay opinion based on his personal knowledge and observations.
Because Investigator Smith's testimony was not expert scientific testimony on blood-spatter analysis, the State was not required to establish Investigator Smith's qualifications as an expert in blood-spatter analysis nor lay a scientific predicate for his testimony. Rule 701, Ala.R.Evid., provides:
"If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear *970 understanding of the witness's testimony or the determination of a fact in issue."
Investigator Smith's opinion was rationally based on his perception of the van when he found Clayton as well as his knowledge of the circumstances surrounding the shooting, and it was helpful to a clear understanding of a fact placed in issue by Gavin, i.e., whether the shooter could have shot Clayton, driven away in the van, and not gotten any blood on his clothing. Therefore, the trial court did not err in allowing Investigator Smith to state his opinion regarding the blood in the van.
Moreover, Investigator Smith's testimony was merely cumulative of other evidence presented during the trial. Dr. Pustilnik testified that the gunshot wounds to Clayton's left hip and left arm would not have bled much, but that the wound to his chest ÔÇö the bullet entered the left side of the chest and exited the right side ÔÇö would have bled quite a bit. According to Dr. Pustilnik, the blood from the chest wounds would first fill up the chest cavity and then, because of gravity, exit the body at the lowest point. This testimony, combined with Investigator Smith's testimony regarding Clayton's position in the van when he was found and eyewitness testimony regarding Gavin's pushing Clayton to the passenger side of the van immediately after the shooting raises the same inference as Investigator Smith's testimony about the blood ÔÇö that no blood would have been on the driver's seat of the van as a result of the shooting, but would have flowed out of the right side of Clayton's chest to the floorboard between the two front seats after he was pushed out of the way by Gavin.
"`[T]estimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.' White v. State, 650 So.2d 538, 541 (Ala.Cr.App.1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239 (Ala.Cr.App.1995).... `The erroneous admission of evidence that is merely cumulative is harmless error.' Dawson v. State, 675 So.2d 897, 900 (Ala.Cr.App.1995)."
Flynn v. State, 745 So.2d 295, 307 (Ala.Crim.App.1999). Therefore, even if the admission of Investigator Smith's testimony was error, it was harmless.
Finally, we point out that the prosecutor questioned Investigator Smith on redirect examination about the blood in the van only because Gavin had asked similar questions on cross-examination. Gavin opened the door for Investigator Smith's testimony through his cross-examination; he cannot now complain that the testimony was improper. See, e.g., Morgan v. State, 589 So.2d 1315, 1320 (Ala.Crim.App.1991)(an appellant "cannot complain about exploration of an issue which the appellant injected into trial").

K.
Gavin contends that the trial court erred in allowing dog handler Tony Holladay to testify regarding his dog's tracking of Gavin in the woods. Specifically, Gavin argues that the State failed to lay the proper predicate for the dog-tracking evidence because, he says, the State failed to establish the training and expertise of both the handler and the dog. Because Gavin did not object to the dog-tracking evidence, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
Holladay testified that he had been a dog handler for the Limestone Correctional Facility for 18 years. He said that his primary responsibility as a dog handler was to "train tracking dogs for the primary purpose of tracking escaped inmates, and also to assist any outside law enforcement agency when they have a felony suspect *971 that they need in the woods or need help apprehending, or to assist for a lost child." (R. 729-30.) Holladay testified that for tracking he uses beagles trained "to run the first human track they encounter." (R. 732.) On cross-examination, Holladay testified that he had been working with the beagle he had used to track Gavin for five years.
When he first arrived at the scene on the night of March 6, 1998, Holladay said, he immediately began gathering information about the suspect and the circumstances of the suspect's flight. He ascertained that the suspect had fled into the woods after firing at Investigator Smith, and that Investigator Smith had chased him for "about 20 yards" but had stopped short of the woods. (R. 732.) Holladay stated that he then requested that Investigator Smith show him the exact spot he stopped chasing the suspect so that his dog would not track Investigator Smith's scent instead of the suspect's scent. Once he determined the location to begin the tracking, he got his dog out of his vehicle, carried the dog to the location, and placed the dog on the ground. According to Holladay, in "less than five seconds, the dog picked the track up" and led him into the woods. (R. 733.) Holladay said that the dog was barking while tracking, which, he said, is an "indication telling me the dog was running the man." (R. 733.) After approximately 10 minutes of tracking in the woods, Holladay said, he and the dog came upon a creek, at which point the dog picked his head up off the ground, which, Holladay said, indicates that he "can smell the suspect" in the vicinity. (R. 733.) Holladay testified that he then waded into the creek, at which point he saw Gavin standing in the creek hiding behind an overhanging bush.
The admissibility of dog-tracking evidence upon a proper predicate has been recognized in Alabama for over a century. See Burks v. State, 240 Ala. 587, 200 So. 418 (1941); Orr v. State, 236 Ala. 462, 183 So. 445 (1938); Loper v. State, 205 Ala. 216, 87 So. 92 (1920); Gallant v. State, 167 Ala. 60, 52 So. 739 (1910); Hargrove v. State, 147 Ala. 97, 41 So. 972 (1906); Richardson v. State, 145 Ala. 46, 41 So. 82 (1906); Little v. State, 145 Ala. 662, 39 So. 674 (1905); Hodge v. State, 98 Ala. 10, 13 So. 385 (1893); Holcombe v. State, 437 So.2d 663 (Ala.Crim.App.1983); Moore v. State, 26 Ala.App. 607, 164 So. 761 (1935); and Allen v. State, 8 Ala.App. 228, 62 So. 971 (1913). As the Alabama Supreme Court noted in 1893, "[i]t is common knowledge that dogs may be trained to follow the tracks of a human being with considerable certainty and accuracy." Hodge, 98 Ala. at 11, 13 So. at 386. The majority of states also recognize the admissibility of dogtracking evidence as long as the proper foundation is laid. See generally J.M. Zitter, Annotation, Evidence of Tracking by Dogs in Criminal Cases, 81 A.L.R.5th 563 (2000), and the cases cited therein.[26] For dog-tracking evidence to be admissible, the State must establish the following: the training and reliability of the dog, the qualifications of the person handling the dog, and the circumstances surrounding the tracking by the dog. The foundational evidence need not be overwhelming or specific, but must be sufficient to indicate reliability of the evidence. See Burks, supra (testimony that handler had 10 years' experience in handling bloodhounds, that the bloodhounds used had been trained to trail human beings, and *972 that the bloodhounds had been used for two years was a sufficient predicate for admissibility of dog tracking evidence).
In this case, we find that the State laid a sufficient foundation for admission of the dog-tracking evidence. Holladay testified that he had 18 years' experience in training and handling dogs, that his dogs were trained to track human beings, and that he had been using the dog he used to track Gavin for five years. Although Holladay did not testify to the dog's previous record in tracking human beings, such as how many times the dog had been used and the success rate of the dog, we believe the absence of testimony regarding the dog's "track record" goes to the weight of the evidence, not its admissibility. In addition, Holladay testified to the circumstances regarding the tracking of Gavin from the location that Investigator Smith had stopped his pursuit. We find no error, much less plain error, in the admission of the dog-tracking evidence.[27]

L.
Gavin contends that the trial court erred in admitting the testimony of Barbara Genovese regarding the statement he made while in jail that "[he] did it." Specifically, Gavin contends that the statement was "vague and equivocal" and, therefore, that its prejudicial effect outweighed its probative value. (Gavin's brief at p. 103.)
As noted in the statement of facts, Barbara Genovese, a supervisor at the Cherokee County jail, testified that in April 1998, when both Gavin and Meeks were incarcerated at the jail, Gavin made a statement to her as she was taking Meeks and another inmate out of their cells to take them outside for exercise. According to Genovese, Gavin called out to her from his cell and asked if he could go outside and exercise with Meeks, and Genovese told Gavin that he could not because when Meeks had initially been brought to the jail, Gavin had become loud and unruly, "screaming and yelling and banging on the doors." (R. 1001.) At that point, Genovese said, Gavin said "Dewayne [Meeks] didn't do anything ... I did it" and "Dewayne should not be in here." (R. 1002.) Genovese testified that she did not know what Gavin was referring to when he said, "I did it." (R. 1002.)
Before Genovese testified, Gavin objected to her testimony and a hearing was held outside the presence of the jury. Gavin argued that his statement to Genovese was inadmissible because, he said, the meaning of the statement was ambiguous and, therefore, the prejudicial effect of the statement outweighed its probative value.[28] The trial court overruled Gavin's objection, finding that any ambiguity in *973 the statement went to its weight, not its admissibility. We agree with the trial court.
"`For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary.'" Ex parte Williams, 780 So.2d 673, 675 (Ala.2000), quoting McLeod v. State, 718 So.2d 727, 729 (Ala.1998). Moreover:
"`Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),] has never been held to apply to statements voluntarily made by defendants. If a defendant spontaneously volunteers information, either before or after being given the Miranda warnings, those statements need not be suppressed.' United States v. Edwards, 885 F.2d 377, 387 (7th Cir.1989). See also Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr.App.1985) (`An unsolicited remark, not in response to any interrogation, does not fall within the Miranda rule'); United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.)(`The protections afforded a suspect under [Miranda] apply only when the suspect is both in custody and being interrogated. A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings.'), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).
"`Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda].'
"Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). See also Britton v. State, 631 So.2d 1073, 1078 (Ala.Cr.App.1993); Williams v. State, 601 So.2d 1062, 1072 (Ala.Cr.App.1991)."
Worthington v. State, 652 So.2d 790, 792-93 (Ala.Crim.App.1994).
Gavin does not argue that his statement was barred by Miranda or that it was otherwise involuntary, and the record reflects that the statement was, in fact, voluntary. In addition, in light of Gavin's repeated attempts during trial to implicate Meeks in Clayton's murder, the statement was clearly relevant and probative to the case and its probative value was not outweighed by its prejudicial effect. As the trial court correctly found, any ambiguity in the meaning of the statement went to its weight, not its admissibility. The trial court did not err in allowing Genovese's testimony regarding Gavin's statement.

M.
Finally, Gavin contends that the cumulative effect of the allegedly improper admission of all of the above evidence warrants reversal of his convictions. However, after thoroughly reviewing the record, and because we have found only one instance of error, which we held to be harmless, we conclude that a cumulative-effect analysis is not applicable here.

VIII.
Gavin contends that the trial court erred in denying his motion for a judgment of acquittal, made at the close of the State's case, and his motion for a new trial because, he says, the evidence was insufficient *974 to sustain his two capital-murder convictions.[29] (Issue XV in Gavin's brief.)
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
"The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983)."
Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992).
Initially, we note that Gavin contends that this Court, in determining whether there was sufficient evidence to sustain his convictions, should not consider much of the evidence against him because, he says, the evidence was improperly admitted. However, in Part VII of this opinion, we hold that the evidence Gavin claims should not be considered in determining the sufficiency of the evidence was properly admitted at his trial. Therefore, that evidence can and will be considered by this Court in addressing the sufficiency of the evidence.
Gavin contends that the evidence was insufficient to sustain his capital-murder convictions because, he says, the testimony of Dewayne Meeks, who, Gavin argues, was an accomplice, was not sufficiently corroborated.
*975 Section 12-21-222, Ala.Code 1975, provides:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
"Before  12-21-222 is invoked, it must clearly appear that the witness is an accomplice, and it is the defendant's burden to prove that a witness is an accomplice, unless the evidence shows without dispute that the witness is an accomplice." Ex parte Davis, 718 So.2d 1166, 1170 (Ala.1998). Whether a witness is an accomplice may be a question of law or fact, depending upon the circumstances of the case. See, e.g., Siler v. State, 705 So.2d 552 (Ala.Crim.App.1997). "When there is a doubt or dispute concerning the complicity of a witness and the testimony is susceptible to different inferences on that point, the question [of whether the witness is an accomplice] is for the jury." Ex parte Bankhead, 585 So.2d 112, 119 (Ala.1991). "When a witness denies willing participation in the crime charged against the defendant, the issue of his being an accomplice is a question of fact for the jury." Id. Moreover, "the mere fact that a witness is indicted for the same crime as the defendant does not alone mark the witness as an accomplice with the defendant in the commission of the crime." Ex parte Davis, 718 So.2d at 1170.
The evidence in this case indicated that Meeks drove Gavin to the scene of the crime. Meeks denied knowing that Gavin was going to shoot Clayton; he claimed he thought Gavin was going to ask the driver of the van for directions. Meeks fled the scene immediately after Gavin shot Clayton and drove back to Illinois before contacting law enforcement about the shooting. These facts presented a jury question as to whether Meeks was an accomplice.[30]
Assuming, however, that Meeks was an accomplice to the crime, we conclude that his testimony was sufficiently corroborated. In Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997), this Court stated the following regarding the corroboration of accomplice testimony:
"`An accomplice's testimony must be supported by evidence connecting the defendant with the commission of the offense rather than merely showing that the offense occurred or the circumstances thereof. Code of Alabama 1975,  12-21-222; Miles v. State, 476 So.2d 1228 (Ala.Cr.App.1985); Jackson v. State, 451 So.2d 435 (Ala.Cr.App.1984).' Hodges v. State, 500 So.2d 1273, 1275 (Ala.Cr.App.1986).

*976 "`"Corroboration need only be slight to suffice." Ingle v. State, 400 So.2d 938, 940 (Ala.Cr.App.1981). "While corroborating evidence need not be strong, it `... must be of substantive character, must be inconsistent with the innocence of a defendant and must do more than raise a suspicion of guilt.' McCoy v. State, 397 So.2d 577 (Ala.Crim.App.), cert. denied, 397 So.2d 589 (Ala.1981)." Booker v. State, 477 So.2d 1388, 1390 (Ala.Cr.App.1985). "However, the corroboration need not be sufficiently strong by itself to warrant a conviction." Miles v. State, 476 So.2d 1228, 1234 (Ala.Cr.App.1985). The requisite corroborative evidence is determined by a process of elimination or subtraction. Caldwell v. State, 418 So.2d 168, 170 (Ala.Cr.App.1981). "The means for analyzing the evidence to determine if there is sufficient evidence to corroborate testimony of an accomplice is to set aside the accomplice's testimony and determine whether or not the remaining evidence tends to connect the defendant with the commission of the offense." Leonard v. State, 459 So.2d 970, 971 (Ala.Cr.App.1984).... Circumstantial evidence is sufficient to show corroboration. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App.1984). See also McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983).'"

Hodges v. State, 500 So.2d at 1275-76.
"In Ware v. State, 409 So.2d 886 (Ala.Cr.App.1981), writ quashed, 409 So.2d 893 (Ala.1982), this court quoted Andrews v. State, 370 So.2d 320, 322 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979), stating:
"`"The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. `Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony.' Malachi v. State, 89 Ala. 134, 140-141, 8 So. 104, 106 (1889); Smith v. State, 230 Ala. 413, 416, 161 So. 538 (1935); Brown v. State, 31 Ala.App. 529, 19 So.2d 88 (1944). The corroborative evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974); Dykes v. State, 30 Ala.App. 129, 1 So.2d 754 (1941). Corroborative evidence need not directly connect the accused with the offense but need only tend to do so. State v. Canada, 107 Ariz. 66, 481 P.2d 859, cert. denied, 404 U.S. 848, 92 S.Ct. 154, 30 L.Ed.2d 87 (1971). See Pearce v. State, 26 Ala.App. 492, 495, 164 So. 114, cert. denied, 231 Ala. 150, 164 So. 118 (1935)(`(B)ut, as we read the cases, the corroboratory evidence, if it meets the test of "tending to connect the defendant with the commission of the offense," need not be, in and of itself alone, that tending in any wise to fasten guilt upon the defendant'); 23 C.J.S. Criminal Law  812(3) (1961). The sufficiency of corroborating evidence is established if its probative value tends to connect the defendant with the commission of the crime. Lowe v. State, 32 Ala.App. 176, 22 So.2d 618 (1945). The corroboration *977 of an accomplice may be shown by circumstantial evidence. Blevins v. State, 56 Ala.App. 115, 319 So.2d 734, cert. denied, 294 Ala. 753, 319 So.2d 739 (1975); Tidwell v. State, 23 Ala.App. 409, 126 So. 186 (1930).
"`"In certain instances, association with the accomplice tending to show the accused's proximity, chronologically and geographically, to the alleged offense may furnish sufficient corroboration. Ross v. State, 74 Ala. 532 (1883); DeGraaf v. State, 34 Ala.App. 137, 37 So.2d 130 (1948)." 370 So.2d at 322.'
"409 So.2d at 891.
"Thus, to constitute sufficient corroboration, a fact or circumstance may tend to support the accomplice's version, thereby confirming his credibility, but in order to provide sufficient corroboration of accomplice testimony, the evidence must connect the accused with the commission of the offense. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App.1984)."
711 So.2d at 1059-60.
After examining the record in this case, we find that Meeks's testimony was amply corroborated. Larry Twilley, an eyewitness to the crime, positively identified Gavin as the person who shot Clayton. Investigator Smith also positively identified Gavin as the person he saw get out of the driver's side of the van in which Clayton was found and run into the woods. These eyewitness identifications, as well as the other evidence presented by the State, were more than sufficient to corroborate Meeks's testimony. Therefore, the trial court did not err in denying Gavin's motion for a judgment of acquittal or his motion for a new trial on the ground of insufficiency of the evidence.

IX.
Gavin contends that the trial court erred in not instructing the jury on reckless murder,  13A-6-2(a)(2), Ala.Code 1975, and felony murder,  13A-6-2(a)(3), Ala.Code 1975, as lesser-included offenses of the capital-murder charges. (Issue XIII in Gavin's brief.) Specifically, he maintains that because Clayton was shot in the hip, arm, and chest, rather than in the head, it was "as likely, if not more likely, that the shooter wished to disable Clayton rather than kill him." (Gavin's brief at p. 118.) Gavin did not request that the trial court instruct the jury on any lesser-included offenses, nor did he object when the trial court did not do so. Therefore, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
"`A person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses.' MacEwan v. State, 701 So.2d 66, 69 (Ala.Crim.App.1997). An accused has the right to have the jury charged on "`any material hypothesis which the evidence in his favor tends to establish.'" Ex parte Stork, 475 So.2d 623, 624 (Ala.1985). `[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however[ ] weak, insufficient, or doubtful in credibility,' Ex parte Chavers, 361 So.2d 1106, 1107 (Ala.1978), `even if the evidence supporting the charge is offered by the State.' Ex parte Myers, 699 So.2d 1285, 1290-91 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998). However, `[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.' *978  13A-1-9(b), Ala.Code 1975. `The basis of a charge on a lesser-included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture.' Broadnax v. State, 825 So.2d 134, 200 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002). "`A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury.'" Williams v. State, 675 So.2d 537, 540-41 (Ala.Crim.App.1996), quoting Anderson v. State, 507 So.2d 580, 582 (Ala.Crim.App.1987)."
Clark v. State, [Ms. CR-99-1062, June 27, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2000)(opinion on return to remand and on application for rehearing).
There was no error, much less plain error, on the part of the trial court in not instructing the jury on reckless murder as a lesser-included offense of the capital-murder charges "`because the appellant's actions were directed solely at the victim.'" Flowers v. State, 799 So.2d 966, 988 (Ala.Crim.App.1999), quoting Hagood v. State, 777 So.2d 162, 190 (Ala.Crim.App.1998), aff'd in pertinent part, rev'd and remanded on other grounds, 777 So.2d 214 (Ala.1999). See also Dallas v. State, 711 So.2d 1101 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.1998); Sockwell v. State, 675 So.2d 4 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995); Parker v. State, 587 So.2d 1072 (Ala.Crim.App.1991), on return to remand, 610 So.2d 1171 (Ala.Crim.App.), aff'd, 610 So.2d 1181 (Ala.1992); and Northington v. State, 413 So.2d 1169 (Ala.Crim.App.1981). A person commits the crime of reckless murder if "[u]nder circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person."  13A-6-2(a)(2), Ala.Code 1975. It is well settled that "[a] charge on reckless murder is not appropriate if the defendant's actions are directed toward one particular person." Phillips v. State, 726 So.2d 292, 296 (Ala.Crim.App.1998). See also Ex parte Simmons, 649 So.2d 1282, 1284 (Ala.1994)(reckless murder "requires the prosecution to prove conduct that manifests an extreme indifference to human life and not to the life of any particular person"); Dunaway v. State, 746 So.2d 1021, 1034-35 (Ala.Crim.App.1998), aff'd, 746 So.2d 1042 (Ala.1999)("A charge on reckless murder is not appropriate where the acts resulting in death are directed toward one or more particular people, as was the case here, rather than toward human life in general."); Knotts v. State, 686 So.2d 431, 458 (Ala.Crim.App.), on return to remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996)("An instruction on reckless murder is not warranted if the accused's conduct was directed toward one individual rather than human life in general."); Leverett v. State, 611 So.2d 481, 482 (Ala.Crim.App.1992)("Where a defendant's acts are specifically directed at a particular victim and no other, the defendant cannot be convicted of murder under the statute dealing with reckless homicide manifesting extreme indifference to human life."); and Haney v. State, 603 So.2d 368, 399 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992)("The doctrine of universal malice, depraved heart murder, or reckless homicide manifesting extreme indifference to human life is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual."). The evidence in *979 this case indicated that Gavin's actions were directed solely at Clayton, who was alone in the van at the time of the shooting. Therefore, there was no reasonable theory from the evidence to support a charge on reckless murder, and the trial court did not err in not instructing the jury on that offense.
There was also no error, or plain error, on the part of the trial court in not instructing the jury on felony murder during a robbery as a lesser-included offense of the charge of capital murder during a robbery because, again, there was no reasonable theory from the evidence to support such a charge. "`"[T]he purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct."'" Dobyne v. State, 672 So.2d 1319, 1345 (Ala.Crim.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), quoting White v. State, 587 So.2d 1218, 1231 (Ala.Crim.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), quoting in turn W. LaFave and A. Scott, 2 Substantive Criminal Law  7.5 at 210 (1986).
"A felony murder is committed when a person commits or attempts to commit one of several enumerated felonies, and, in the course of or in furtherance of the crime or in flight from the crime, that person causes another person's death. There is an intended felony and an unintended homicide. Ex parte Bates, 461 So.2d 5 (Ala.1984); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993); C. Torcia, Wharton's Criminal Law,  147 (15th ed.1994)."
Knotts, 686 So.2d at 457. We are not persuaded by Gavin's argument that because Clayton was shot in the hip, arm, and chest, and not in the head, this showed a lack of an intent to kill. The evidence established that Gavin shot Clayton twice at point blank range with a .40 caliber pistol. There was no reasonable theory from this evidence that Gavin did not intend to kill Clayton. See, e.g., Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001); Woods v. State, 789 So.2d 896 (Ala.Crim.App.1999), aff'd, 789 So.2d 941 (Ala.2001); and Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000). Therefore, the trial court did not err in not instructing the jury on felony murder as a lesser-included offense of capital murder during a robbery.

X.
Gavin contends that during closing arguments the prosecutor improperly commented on his decision not to testify. (Issue XIV in Gavin's brief.) Specifically, he maintains that the prosecutor made "thinly veiled" references to his decision not to testify by repeatedly referring to the facts, evidence, and testimony as "uncontroverted." (Gavin's brief at p. 121.) Gavin specifically objected to three of the prosecutor's references, but he did not do so until after the conclusion of the prosecutor's closing argument; therefore, his objection was not timely. In addition, he did not object to any of the other references about which he now complains on appeal.[31] Thus, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
*980 The record reflects that during opening statements, Gavin's counsel stated the following:
"What you're going to hear over the next several days is some facts and the State's interpretation of those facts. But the Judge is going to tell you that your primary role in this case is to determine the facts and interpret those facts for yourself. And I ask you first and foremost, don't determine the facts in your mind until you've heard all the facts. In truth, while [the prosecutor] appears to have woven a very persuasive tale of two men or three men, there are few incontrovertible facts that he is going to present to you. There are a lot of unanswered questions. Indeed, there are a lot of unasked questions, questions that should have been asked, questions which I submit to you as a jury you're going to be asking yourself over the next few days, and you're not going to get the answers because the State is not going to tell you the answers to those questions because they haven't asked the questions. It is incontrovertible and we will not argue that on the evening of March 6, 1998, someone shot William Clinton Clayton to death around 6:30, 6:40 p.m. right out here at the Regions Bank. And it is uncontroverted that some three hours, three hours and 15 minutes later Keith Gavin was arrested about 12 or 15 miles northwest of here in a wooded area up off of Highway 68 and the intersection of [Highway] 48 as [the prosecutor] told you, and that seven days later, the gun that the State alleges, and it appears fairly convincing, the gun that the State alleges was used to kill William Clinton Clayton was found in that same wooded area. The evidence is not going to show that there was any type of security between March the 6th, midnight, and March the 13th, seven days later when that gun was found, even though they were looking for it in that area for seven days and for seven days they couldn't find it, but after seven days of looking for it, they found the gun, but in that seven days there had been no security and they're not going to tell you that anything on that gun is going to connect itself, is going to connect that gun to Keith Gavin. But the evidence is going to show that that was Dewayne Meeks's gun.... And the evidence is going to show that when Mr. Meeks returned to Chicago, and not before, he reported to authorities that that gun had been stolen.... But those are pretty much incontrovertible facts about this case."
(R. 505-07.)(Emphasis added.)
During closing arguments, the prosecutor stated, in pertinent part:
"I went back last night to when we concluded here and I began to look over some of the things that we both said during our opening statements, and one of the things that really struck me about what [Gavin's counsel] said was there were few uncontroverted facts and many questions that should have been answered. Well, I believe you've seen and heard at the conclusion of this case that there are a great many uncontroverted facts. In fact, I would venture to submit to you, ladies and gentlemen, that based on the evidence you heard, there are no gaps or facts that have not withstood the test of time and the test of truth."
(R. 1091-92.) The prosecutor then began sifting through the evidence that had been presented during the trial, repeatedly referring to facts, evidence, and testimony as "uncontroverted." In all, the prosecutor used the term "uncontroverted" 15 times during his closing argument.
"A comment on the defendant's failure to testify is to be `scrupulously *981 avoided.'" Taylor v. State, 808 So.2d 1148, 1186 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), quoting Arthur v. State, 575 So.2d 1165, 1186 (Ala.Crim.App.1990).
"Alabama, by statute, specifically protects the privilege against self-incrimination from comment by the prosecution.  12-21-220, Ala.Code 1975. A prosecutor must be extremely careful not to overstep the mark or to break with the established protocol regarding statements about that privilege. [Ex parte] Musgrove, [638 So.2d 1360 (Ala.1993)]. To improperly comment on that privilege would be a clear violation of the defendant's rights under Article I,  6, Ala. Const.1901, as well as the rights protected by the Fifth Amendment as that Amendment is incorporated into the Fourteenth Amendment to the United States Constitution."
Windsor v. State, 683 So.2d 1021, 1024 (Ala.1994).
"Comments by a prosecutor on a defendant's failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant's constitutional right not to testify. Whitt [v. State, 370 So.2d 736, 739 (Ala.1979)]; Ex parte Williams, 461 So.2d 852, 853 (Ala.1984); see Ex parte Purser, 607 So.2d 301 (Ala.1992).... Under federal law, a comment is improper if it was '"`manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'"' United States v. Herring, 955 F.2d 703, 709 (11th Cir.), cert. denied, 506 U.S. 927, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.
"Consistent with this reasoning, Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant's failure to testify mandates the reversal of the defendant's conviction, if the trial court failed to promptly cure that comment. Whitt v. State, supra; Ex parte Yarber, [375 So.2d 1231 (Ala.1979)]; Ex parte Williams, supra; Ex parte Wilson, supra. On the other hand, `covert,' or indirect, comments are construed against the defendant, based upon the literal construction of Ala.Code 1975,  12-21-220, which created the `virtual identification doctrine.' Ex parte Yarber, 375 So.2d at 1234. Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So.2d at 1234; Ex parte Williams, supra; Ex parte Wilson, supra; Ex parte Purser, supra. A virtual identification will not exist where the prosecutor's comments were directed toward the fact that the State's evidence was uncontradicted, or had not been denied. See Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975); Ex parte Williams, supra; Ex parte Purser, supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence."
Ex parte Brooks, 695 So.2d 184, 188-89 (Ala.1997)(footnotes omitted).
*982 "Not every comment that refers or alludes to a nontestifying defendant is an impermissible comment on his failure to testify; the prosecutor has a right to comment on reasonable inferences from the evidence." Ex parte Loggins, 771 So.2d 1093, 1101 (Ala.2000).
"Although counsel has `no right to create evidence by his argument,' Davis v. State, 49 Ala.App. 587, 590, 274 So.2d 360, 363 (1972), cert. denied, 290 Ala. 364, 274 So.2d 363 (1973), `counsel may draw any inference which the facts tend to support.' Brothers v. State, 236 Ala. 448, 452, 183 So. 433, 436 (1938). `Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence.' Arant v. State, 232 Ala. 275, 279, 167 So. 540, 543 (1936). `Counsel has a right to argue any reasonable inference from the evidence or lack of evidence ... and to draw conclusions from the evidence based on their own reasoning.' Roberts v. State, 346 So.2d 473, 476 (Ala.Cr.App.), cert. denied, 346 So.2d 478 (Ala.1977)."
Kuenzel v. State, 577 So.2d 474, 493-94 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). "Further, a prosecutor has the right to indicate to the jury those parts of the evidence or testimony presented by the State that the defense has failed to contradict; that process is not an infringement of the defendant's Fifth Amendment privilege against self-incrimination." Ex parte Brooks, 695 So.2d at 180.
"`The general rule is that statements by the prosecutor to the effect that [the] State's evidence is undenied or uncontroverted are merely indirect references to the defendant's failure to testify and thus do not violate the statute. Swain v. State, 275 Ala. 508, 156 So.2d 368, affirmed on other grounds, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; Welch v. State, 263 Ala. 57, 81 So.2d 901; Gore v. State, 45 Ala.App. 131, 226 So.2d 674. Under this rule the following remarks by prosecuting attorneys have been held permissible notwithstanding the statute: "Gentlemen, do you think we have proved those three elements? I submit to you that it is not denied, there is not a word come from this stand that denied the charge of rape." Swain, supra. "Mr. Smith criticizes our witness in this case, but Mr. Smith has not given us any witness to criticize." Broadway v. State, 257 Ala. 414, 60 So.2d 701. "The testimony of the State is uncontradicted and no one has denied it.["] Gore, supra. "The fact that Mr. Johnson has been robbed was not contradicted." White v. State, 44 Ala.App. 312, 208 So.2d 222. "The testimony of the state is undisputed. No testimony was presented from the witness stand to contradict any testimony of the State.["] Williams v. State, 43 Ala.App. 343, 190 So.2d 556. The trial court may allow remarks of this tenor so long as the defendant is not the only witness capable of contradicting the State's proof. If the prosecutor's remarks can be interpreted as referring to the failure of the defense to produce as witnesses existing persons other than the defendant who should be [in] a position to testify in his favor, and who are known to him, then the general rule stated above applies and there [is] no violation of the statute. See Street v. State, 266 Ala. 289, 96 So.2d 686; Broadway, supra; Gore, supra; Padgett v. State, 45 Ala.App. 56, 223 So.2d 597; Williams, supra; Littlefield v. State, 36 Ala.App. 507, 63 So.2d 565; c.f. King v. State, 45 Ala.App. 348, 230 So.2d 538.'"
*983 Arthur v. State, 711 So.2d 1031, 1049-50 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997), quoting Sellers v. State, 48 Ala.App. 178, 187, 263 So.2d 156, 164-65 (1972).
After thoroughly reviewing the prosecutor's closing argument, we conclude that the majority of the prosecutor's references to "uncontroverted" facts, testimony, and evidence were not directed toward Gavin's decision not to testify; they "merely refer[red] to the fact that the evidence was uncontradicted." Arthur, 711 So.2d at 1049. The comments did not "virtually identify" Gavin as the only person who could contradict the evidence, but were general comments, in direct response to Gavin's opening statement, on the fact that the majority of the State's evidence was uncontradicted. For example, the prosecutor referred to Meeks's testimony about the shooting as uncontradicted. There were three other eyewitnesses to the murder; therefore, contrary to Gavin's contention, he was not the only person who could have refuted Meeks's testimony about the shooting. The prosecutor also referred to the motel-room key found in Gavin's pants pocket and the testimony indicating that that key fit room 113 in the Super 8 Motel in Chattanooga as "uncontradicted facts." (R. 1093.) Again, Gavin was not the only person who could have contradicted this evidence. Most of the prosecutor's other references to "uncontradicted" facts and testimony were similar to those just mentioned and were not manifestly intended or of such a character that a jury would naturally and necessarily take them to be comments on Gavin's choice not to testify.
The record also reflects, however, that the prosecutor referred to Investigator Smith's testimony regarding his following the van and his identification of Gavin as the person who was driving the van and who shot at him as uncontradicted. It is clear from the evidence presented at the trial that the only person who could have contradicted Investigator Smith's testimony that it was, in fact, Gavin, who had been driving the van and who shot at him and then fled into the woods, was Gavin himself. However, we do not believe this comment rises to the level of plain error requiring reversal.
During its oral charge, immediately following its explanation on the presumption of innocence, the trial court instructed the jury as follows:
"Mr. Gavin has no burden of proof. Mr. Gavin is not required to prove his innocence because the law presumes that he is innocent. The defendant has the right under the law to elect not to testify. And if he does so elect, this creates no presumption against him. You should draw no inference nor any conclusion from the fact that Mr. Gavin did not testify, and the defendant's election not to testify should have no weight in reaching your verdict. In other words, the fact that Mr. Gavin has not testified in this case is not a matter that you should consider in your deliberations. Mr. Gavin has a right not to testify and the exercise of this right must not be used against him. Just as the presumption that Mr. Gavin is innocent remains with him throughout every stage of the trial, likewise, the burden of proof remains on the State of Alabama throughout every stage of the trial."
(R. 1182-83.) In addition, the trial court instructed the jury, both before the trial began and during its oral charge, that arguments of counsel are not evidence.
Contrary to Gavin's contention in his brief, comments on a defendant's decision not to testify are subject to harmless-error analysis. See, e.g., Ex parte Brooks, supra; Simmons v. State, 797 So.2d 1134 *984 (Ala.Crim.App.1999); Hammonds v. State, 777 So.2d 750 (Ala.Crim.App.1999), aff'd, 777 So.2d 777 (Ala.2000); Baxter v. State, 723 So.2d 810 (Ala.Crim.App.1998); and Long v. State, 668 So.2d 56 (Ala.Crim.App.1995). In Long, this Court stated:
"Moreover, even if the statement might have been construed as an improper comment on the appellant's failure to testify, any error would have been harmless in this case.
"`The United States Supreme Court has ... held ... "that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Chapman involved comments on the failure of defendants to testify at trial....
"`In United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), the Court cited "the interest in the prompt administration of justice and the interests of the victims" in reversing the judgment of a lower federal appellate court for not applying the harmless error doctrine to a prosecutor's comment on a defendant's failure to proffer evidence to rebut testimony presented by the prosecution, when the defendant had elected not to testify. 461 U.S. at 509, 103 S.Ct. at 1980. In so holding, the Court observed that "[s]ince Chapman, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations," id. (citations omitted), and stated that the proper question for a reviewing court to ask is: "[A]bsent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" Id. at 510-11, 103 S.Ct. at 1981.
"`Our harmless error rule provides in pertinent part:
"`"No judgment may be reversed or set aside ... on the ground of misdirection of the jury unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it would appear that the error complained of has probably injuriously affected substantial rights of the parties."
"`Rule 45, Ala.R.App.R.
"`This rule provides for "an examination of the entire cause" and, like both the California constitutional provision and the federal statute compared in Chapman, it emphasizes errors "that `affect substantial rights' of a party." Chapman, 386 U.S. at 23, 87 S.Ct. at 828.'
"Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993)."
668 So.2d at 63-64.
After thoroughly reviewing the entire record, we conclude that any error in the prosecutor's comment that Investigator Smith's testimony was uncontradicted was harmless. This particular remark was not one of the comments Gavin objected to at trial, thus indicating that, at the time it was made, Gavin did not believe the remark to be prejudicial. In addition, in response to Gavin's objection at trial, the prosecutor stated that he had not intended any of his references to "uncontradicted" evidence to be comments on Gavin's decision not to testify. Moreover, all of the *985 prosecutor's references to "uncontradicted" facts, testimony, and evidence were in direct response to Gavin's opening statement. Finally, the evidence against Gavin in this case was overwhelming. See, e.g., Thomas v. State, 824 So.2d 1, 31-32 (Ala.Crim.App.)(noting that some factors to be considered in evaluating whether a prosecutor's comment was harmless are the lack of a contemporaneous objection, the prosecutor's intent in making the comment, and the overwhelming evidence of the appellant's guilt). In light of the evidence presented in this case and the circumstances surrounding the prosecutor's comment, we conclude that any error was harmless beyond a reasonable doubt.

XI.
Gavin contends that the State withheld impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (Issue XII in Gavin's brief.)
"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S.Ct. 1194.
"To prove a Brady violation, a defendant must show that '"(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial."' Johnson v. State, 612 So.2d 1288, 1293 (Ala.Cr.App.1992), quoting Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990), cert. denied, Stano v. Singletary, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). See Smith v. State, 675 So.2d 100 (Ala.Cr.App.1995). '"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome."' Johnson, 612 So.2d at 1293, quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)."
Freeman v. State, 722 So.2d 806, 810 (Ala.Crim.App.1998).
Brady applies equally to exculpatory and impeachment evidence. See Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
"The same standard of materiality and the same due process requirement apply whether the evidence would have been useful for exculpation or for impeachment. `When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within [the] general rule.' Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1971)(quoting Napue v. Illinois, 360 U.S. 264, 266, 79 S.Ct. 1173, 1175, 3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when the evidence would tend to exculpate the accused or to impeach the veracity of a critical state's witness."
Ex parte Willingham, 695 So.2d 148, 151-152 (Ala.1996).
Gavin makes two arguments regarding the suppression of evidence, neither of which were raised in the trial court. Therefore, we review both claims under the plain-error rule. See Rule 45A, Ala.R.App.P.

A.
First, Gavin contends that the State withheld evidence of a deal it had *986 made with Dewayne Meeks in exchange for his testimony; specifically, that the State dismissed the capital-murder charge against Meeks in exchange for his testimony against Gavin.
Before trial, Gavin filed a motion to reveal any deals the State had made with its witnesses, including Meeks. At a pretrial hearing on that motion, the following occurred:
"[Prosecutor]: Your Honor, we have not given any incentives nor had any agreements with any witness who will give testimony in this case. We will, however, point out that there was a codefendant, Dewayne Meeks, who had been indicted at the same time as Mr. Gavin. After further investigation of the statements given by Mr. Meeks, my office and the investigators in this case were convinced that Mr. Meeks was being truthful and was not involved in the perpetration of this or either of these crimes and we did, in fact, dismiss his case. So he is no longer a codefendant. Other than that acknowledgment to the court and to the defense, we have no other witnesses with which we had any kind of discussions at all or with whom there would be any discussions.
"THE COURT: Is the State representing to the court and to the defendant and his counsel that there was no agreement made with Mr. Meeks in exchange for dismissal of those cases?
"[Prosecutor]: That's correct. We would, however, though, Judge, anticipate calling Mr. Meeks as a witness since he was present at the time of the shooting, but we would tell the court that we did not condition his dismissal upon his testimony. There was no such agreement...."
(R. 14-15.)
The prosecutor stated that there was no agreement with Meeks for his testimony, and Gavin has failed to show otherwise. The State cannot suppress evidence that does not exist. There was no Brady violation in this regard.

B.
Second, Gavin contends that the State withheld evidence that, at the time of his trial, the medical examiner, Dr. Pustilnik, was under investigation by the Department of Forensic Sciences for "substandard work" in an unrelated case. (Gavin's brief at p. 115.) According to Gavin, Dr. Pustilnik had misdiagnosed the cause of death in another case ÔÇö stating that the cause of death was asphyxiation when a later autopsy by Dr. Pustilnik's supervisor revealed a gunshot wound to the head that was the true cause of death and that Dr. Pustilnik had not discovered the wound during the initial autopsy. Gavin maintains that Dr. Pustilnik's misdiagnosis was discovered in August 1999, before his trial, and that under Brady it should have been disclosed to him for impeachment purposes.
As noted above, this issue is being raised for the first time on appeal, and Gavin concedes in his brief that nothing in the record supports his assertion regarding Dr. Pustilnik because, he admits, this issue only came to his attention "subsequent to the closure of the record in this cause." (Gavin's brief at p. 114.)[32] "The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act *987 upon which error is predicated ever occurred." Ex parte Watkins, 509 So.2d 1074, 1077 (Ala.1987). "Without any evidence in the record on appeal to support the allegation of error, this court cannot consider the alleged error even under the `plain error' doctrine." Kuenzel v. State, 577 So.2d 474, 482 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
"`Even though ... this Court [is] required to search the record for plain error in every case in which the death sentence has been imposed and to take the appropriate action when such error is found, ... this Court will [not] presume that reversible error occurred at trial when there is nothing in the record to so indicate, ....'"
Id., quoting Ex parte Godbolt, 546 So.2d 991, 998 (Ala.1987). Because nothing in the record supports Gavin's assertion that the State withheld impeachment evidence concerning Dr. Pustilnik, or even that such impeachment evidence existed, we find no plain error as to this claim.
Moreover, we reject Gavin's request to remand this case to allow him to create a record on this issue because "to do otherwise would unduly enlarge the scope of the plain error review as authorized by our appellate rules." Ex parte McNair, 653 So.2d 353, 360 (Ala.1994). See also Ex parte Watkins, supra.

XII.
Gavin contends that electrocution constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. (Issue II in Gavin's brief.)
Recently, the Alabama Legislature amended  15-18-82, Ala.Code 1975, which sets out the time, place, and method of executions in Alabama, and it added  15-18-82.1, Ala.Code 1975. Section 15-18-82.1(a) provides:
"A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution. The sentence shall be executed pursuant to Section 15-18-82."
Newly amended  15-18-82(a) now provides:
"Where the sentence of death is pronounced against a convict, the sentence shall be executed at any hour on the day set for the execution, not less than 30 nor more than 100 days from the date of sentence, as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law. If electrocution is held unconstitutional, the method of execution shall be lethal injection."
These sections became effective July 1, 2002, and apply to all inmates currently on death row. Because the primary method of execution in Alabama has been changed from electrocution to lethal injection, Gavin's argument is moot. See Clark v. State, [Ms. CR-99-1062, June 27, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2003)(opinion on return to remand and on application for rehearing); Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App.2002); Tomlin v. State, [Ms. CR-98-2126, May 31, 2002] ___ So.2d ___ (Ala.Crim.App.2002); and Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002).

XIII.
Gavin also contends that the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires that his sentence of death be vacated. (Issue I in Gavin's supplemental brief.) Gavin makes several arguments regarding the impact of Ring, all of which have been addressed and decided adversely to him either by this *988 Court or by the Alabama Supreme Court. See Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003); Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Clark v. State, [Ms. CR-99-1062, June 27, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2000)(opinion on return to remand and on application for rehearing); Ziegler v. State, 886 So.2d 127, 150 (Ala.Crim.App.2003)(opinion on return to remand); Lee v. State, [Ms. CR-00-0084, June 27, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2001)(opinion on return to remand); Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003); Peraita v. State, [Ms. CR-01-0289, May 30, 2003] ___ So.2d ___ (Ala.Crim.App.2003); Martin v. State, [Ms. CR-99-2249, May 30, 2003] ___ So.2d ___ (Ala.Crim.App.2003); McNabb v. State, 887 So.2d 929, 989 (Ala.Crim.App.2001)(opinion on application for rehearing); Moody v. State, 888 So.2d 532 (Ala.Crim.App.2003); Duke v. State, 889 So.2d 1, 40 (Ala.Crim.App.2002)(opinion on return to remand); Stallworth v. State, 868 So.2d 1128, 1177 (Ala.Crim.App.2001)(opinion on return to second remand); Harrison v. State, 869 So.2d 509, 526 (Ala.Crim.App.2002)(opinion on application for rehearing); Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App.2002); and Tomlin v. State, [Ms. CR-98-2126, November 22, 2002] ___ So.2d ___, ___ (Ala.Crim.App.2002)(opinion on application for rehearing). Gavin's death sentence is not invalid under Ring.

XIV.
Gavin contends that the trial court's findings concerning the aggravating and mitigating circumstances were improper. (Issues XVI and XVIII in Gavin's brief.) He makes two arguments in this regard; we address each in turn.

A.
First, Gavin contends that the trial court erred in finding as an aggravating circumstance that he committed the crime while under a sentence of imprisonment, see  13A-5-49(1), Ala.Code 1975. He argues that although parole from an Alabama conviction would constitute being under a sentence of imprisonment under  13A-5-49(1), "[t]here is nothing in the record to indicate that the legal status of the defendant with the Illinois authorities was within the ambit of the language of Ala.Code [1975,]  13A-5-49(1)." (Gavin's brief at p. 127.)
Section 13A-5-39(7), Ala.Code 1975, defines the term "under sentence of imprisonment" as used in  13A-5-49(1) as "while serving a term of imprisonment, while under a suspended sentence, while on probation or parole, or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom after expiration of the term of sentence." Nothing in the definition of "under sentence of imprisonment" limits the term to parole from an Alabama conviction, as opposed to parole from a conviction in another state. See, e.g., Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003)(upholding death sentence where trial court found as an aggravating circumstance that the capital offense was committed while the defendant was under a sentence of imprisonment based on the fact that the defendant was on parole from felony convictions in Georgia).
Severia Morris, a parole supervisor from the Illinois Department of Corrections, testified that, at the time Clayton was murdered in March 1998, Gavin was on parole from the Illinois Department of Corrections. Gavin had been convicted in *989 1982 of murder and served approximately 17 years of a 34-year sentence; he had been paroled in December 1997. This testimony was sufficient to establish that Gavin was "under a sentence of imprisonment" pursuant to  13A-5-49(1) at the time of Clayton's murder.
Therefore, the trial court did not err in finding the existence of the aggravating circumstance in  13A-5-49(1) that Gavin was under a sentence of imprisonment.

B.
Second, Gavin contends that the trial court erred in finding no statutory or nonstatutory mitigating circumstances to exist. He maintains that the trial court should have found the existence of the statutory mitigating circumstances (1) that he was under the influence of extreme mental or emotional disturbance at the time of the crime, see  13A-5-51(2), Ala.Code 1975, and (2) that his capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the crime, see  13A-5-51(6), Ala.Code 1975. In addition, he argues that the trial court should have found the following to constitute nonstatutory mitigation: (1) his disadvantaged background growing up in a Chicago housing project; (2) his potential for rehabilitation, as evidenced by the fact that he attained his GED certificate while serving his prison term in Illinois; (3) the fact that he is a religious person; and (4) that because the victim was not shot in the head "it is more likely than not that the shooter, even were it conceded to be the defendant, intended to disable the victim rather than kill him." (Gavin's brief at p. 130.)
"`In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating. Lockett provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process.'
"Ex parte Hart, 612 So.2d 536, 542 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).' "While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."' Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd, 625 So.2d 1146 (Ala.1993). `Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.' Harrell v. State, 470 So.2d 1303, 1308 (Ala.Crim.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
"`"A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant *990 mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)."'
"Wilson v. State, 777 So.2d 856, 892 (Ala.Crim.App.1999), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). The fact that the trial court does not list and make findings in its sentencing order as to each alleged nonstatutory mitigating circumstance offered by a defendant indicates that the trial court found some of the offered evidence not to be mitigating, not that the trial court did not consider this evidence. See, e.g., Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999)."
Reeves v. State, 807 So.2d 18, 47-48 (Ala.Crim.App.2000).
In its sentencing order, the trial court made the following findings regarding mitigating circumstances:
"In compliance with the statutory requirement that the trial court enter specific findings concerning the existence or nonexistence of each mitigating circumstance enumerated by statute, the Court finds that NONE OF THE FOLLOWING MITIGATING CIRCUMSTANCES EXIST in this case:
"1. THAT THE DEFENDANT HAD NO SIGNIFICANT HISTORY OF PRIOR CRIMINAL ACTIVITY.
"The defendant was convicted of Burglary in Cook County, Illinois, on October 25, 1979. He was also convicted of Murder on June 9, 1982, in Cook County, Illinois.
"The presentence report indicates that the defendant has been charged or implicated in other criminal activity, but there is no record of conviction for any offense other than the prior crime of murder and burglary as stated above. To the extent that the presentence report suggests any other criminal activity, same is not considered an aggravating circumstance, and has not been weighed as such by this Court.
"This Court finds that there is no support for this mitigating circumstance.
"2. THAT THE CAPITAL OFFENSE WAS COMMITTED WHILE THE DEFENDANT WAS UNDER THE INFLUENCE OF EXTREME MENTAL OR EMOTIONAL DISTURBANCE.

*991 "During the few hours leading up to the murder of Mr. Clayton, Meeks had apparently insisted on being reimbursed for his expenses in bringing the defendant to Alabama. These demands did not invoke extreme mental or emotional disturbance, although this may explain the defendant's motive for the robbery.
"The defendant is an intelligent person capable of making independent choices.
"There was no plea of mental disease or defect, and at no time did the defendant seek to have a mental evaluation for the purpose of asserting such a defense.
"The Court finds that there is no support for this mitigating circumstance. "3. THAT THE VICTIM WAS A PARTICIPANT IN THE DEFENDANT'S CONDUCT OR CONSENTED TO IT.
"The Court finds that there is no support for this mitigating circumstance. "4. THAT THE DEFENDANT WAS AN ACCOMPLICE IN THE CAPITAL OFFENSE COMMITTED BY ANOTHER, AND HIS PARTICIPATION WAS RELATIVELY MINOR.
"The defendant was identified by an eyewitness as the person who committed the offense in question. Likewise, Meeks reported that the defendant committed the murder and robbery of Mr. Clayton. Nevertheless, Meeks was indicted along with the defendant. The State subsequently dismissed the charge against Meeks who thereafter testified against the defendant on behalf of the State.
"There is no direct evidence that the State's dismissal was a quid-pro-quo for Meeks' testimony, but throughout the trial, the defendant's attorneys attempted to impeach Meeks' credibility by proving that he was originally charged in the case, and that by virtue of the dismissal of those charges, he was thereby motivated to testify falsely against the defendant.
"The defendant's attorneys also challenged the forensic evidence in an effort to try to implicate Meeks as the guilty party. For example, the defendant argued that the driver would have been covered with the victim's blood, but no blood was found on the defendant or on his clothes even by DNA examination. In addition, there was no evidence of the defendant's fingerprints in or on the courier van. The defendant also argued that even though he was arrested standing waist deep in a creek, he was not submersed long enough to completely cleanse blood from his clothes, and that if he had been submersed long enough to have that effect, he would have died from hypothermia.
"The defendant was identified by Officer Danny Smith who viewed the defendant at a distance of only a few feet when the defendant exited the stolen van, fired at Officer Smith and escaped into the woods. A toboggan [cap] matching the description reported by eyewitnesses was found near the site where the defendant was apprehended, and Meeks' gun was later found near where the defendant entered the woods as he escaped from Officer Smith.
"The ballistics analysis established that the shell casings ejected by the weapon fired at Officer Smith were identical to the shell casings found in the street at the site where Mr. Clayton was shot, and that the casings from both sites were fired by the weapon found in the woods near where the defendant was apprehended.
"In summary, the defendant attempted to implicate Meeks as the killer by a combination of the challenges to the forensic *992 evidence coupled with his challenge of Meeks' credibility. The defendant emphasized the undisputed fact that Meeks drove the defendant to the scene of the crime, and that Meeks' pistol was the murder weapon. The evidence of the defendant's guilt is, however, overwhelming.
"There is no basis on which to conclude that the defendant was merely an accomplice with minor participation in the crime. This court finds that there is no support for this mitigating circumstance.
"5. THAT THE DEFENDANT ACTED UNDER EXTREME DURESS OR UNDER THE SUBSTANTIAL DOMINATION OF ANOTHER PERSON.
"This Court finds that there is no support for this mitigating circumstance.
"6. THAT THE CAPACITY OF THE DEFENDANT TO APPRECIATE THE CRIMINALITY OF HIS CONDUCT OR TO CONFORM HIS CONDUCT TO THE REQUIREMENTS OF LAW WAS SUBSTANTIALLY IMPAIRED.
"This Court finds that there is no support for this mitigating circumstance.
"7. THE AGE OF THE DEFENDANT AT THE TIME OF THE CRIME.
"At the time of the commission of the offense of March 6, 1998, the defendant was 37 years of age. The age of the defendant is not a mitigating circumstance.
"....
"In addition to the mitigating circumstances specified by statute, and the findings of this Court relating thereto as set out above, mitigating circumstances include any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.
"As a supplement to the Probation Officer's written report, the defendant has provided a memorandum from sentencing consultant, John David Sturman and Associates of Chicago, Illinois; the whole of which said memorandum has been considered by this court. In that memorandum the defendant's mother is reported to have described the defendant's life as influenced by, or subject to, a combination of drugs and gang violence while living in a Chicago housing project. The defendant's mother also testified at the sentence hearing conducted before the jury. The defendant's attorney has advised the court, however, that the defendant denies ever having a drug problem.
"At the sentence hearing conducted before the jury the court heard testimony of Rev. A.J. Johnson who spoke eloquently on behalf of the defendant as a result of his frequent meetings with the defendant over the many months of the defendant's incarceration. Rev. Johnson opines that the defendant has concern and sympathy for the victim's family, and that the defendant is capable of a closer relationship with God.
"This court has considered all matters presented by the defendant, but this court does not find any support for any non-statutory mitigating circumstance."
(C. 190-96.)(Capitalization in original.)
The sentencing order shows that the trial court considered all of the mitigating evidence offered by Gavin. The trial court did not limit or restrict Gavin in any way as to the evidence he presented or *993 the arguments he made regarding mitigating circumstances. In its sentencing order, the trial court addressed each statutory mitigating circumstance listed in  13A-5-51, Ala.Code 1975, and it determined that none of those circumstances existed under the evidence presented. In addition, the trial court set forth the nonstatutory mitigating evidence offered by Gavin, and concluded that the evidence did not rise to the level of a mitigating circumstance. The trial court's findings in this regard are supported by the record.
Because it is clear from a review of the entire record that the trial court understood its duty to consider all the mitigating evidence presented by Gavin, that the trial court did in fact consider all such evidence, and that the trial court's findings are supported by the evidence, we find no error in the trial court's findings regarding the statutory and nonstatutory mitigating circumstances.

XV.
Finally, Gavin reminds this Court of its responsibility in reviewing death sentences under  13A-5-53(b), Ala.Code 1975. (Issues XVII, XVIII, and XIX in Gavin's brief.) We undertake our mandated review of the death sentence in Part XVI of this opinion. However, we find it prudent at this point to address some of Gavin's specific arguments regarding his death sentence.
First, Gavin contends that his sentence of death was imposed under the influence of passion, prejudice, and other arbitrary factors, see  13A-5-53(b)(1), Ala.Code 1975, because, he says, capital indictments in Cherokee County are returned arbitrarily, capriciously, and discriminatorily. However, we have already determined that capital indictments in Cherokee County are not returned in an arbitrary, capricious, or discriminatory manner. (See Part I of this opinion.) Therefore, there is no support for Gavin's argument in this regard.
Gavin also contends that death is not the appropriate sentence in his case because, he says, the aggravating circumstances do not outweigh the mitigating circumstances, see  13A-5-53(b)(2). In support of this argument, Gavin asks this Court to consider several mitigating circumstances that the trial court found not to exist. (See Part XIV of this opinion.) However, as this Court stated in Roberts v. State, 735 So.2d 1244 (Ala.Crim.App.1997):
"In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in a particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances and the mitigating circumstances as found by the trial court."
735 So.2d at 1269 (emphasis added). See also Clark v. State, [Ms. CR-99-1062, June 27, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2000)(opinion on return to remand and on application for rehearing), and Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.1997). This Court cannot, as Gavin urges us to do, consider mitigating circumstances not found to exist by the trial court.
Finally, Gavin contends that "the fact that the co-defendant, Dewayne Meeks, was allowed to walk away without prosecution, creates a severe disproportionality" in his sentence of death, see  13A-5-53(b)(3), and that the trial court should have considered the fact that Meeks was not prosecuted as a mitigating circumstance. (Gavin's brief at p. 131.)
Although Meeks was initially charged with the capital murder, that charge was dismissed because the prosecutor and the investigators believed that Meeks was not *994 a participant in the murder. Meeks testified at trial that he did not participate in the murder, but that when Gavin got out of the car, he thought Gavin was going to ask the driver of the van for directions. Nothing in the record supports Gavin's assertion that Meeks was a participant in the murder and that Meeks's lack of prosecution should have been considered by the trial court. Compare Ex parte Burgess, 811 So.2d 617 (Ala.2000)(holding that the trial court should have considered in mitigation the fact that Burgess was the only one of six participants in the crime (two of whom admitted that they participated in the crime) who was charged with, and prosecuted for, the murder). Thus, we find no error on the part of the trial court in not finding the fact that Meeks was not prosecuted to be a mitigating circumstance.
Moreover, even assuming that Meeks was an accomplice in the murder, merely because he was not prosecuted does not automatically make Gavin's death sentence disproportionate. See, e.g., Arthur v. State, 711 So.2d 1031, 1096 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997)("the fact that two of the appellant's accomplices were not prosecuted does not make his death sentence disproportionate"), and Neelley v. State, 494 So.2d 669, 682 (Ala.Crim.App.1985), aff'd, 494 So.2d 697 (Ala.1986)(the appellant's death sentence was not disproportionate despite the fact that her accomplice had not been prosecuted for his participation in the murder).
"The law does not require that each person involved in a crime receive the same sentence. Wright v. State, 494 So.2d 726, 739 (Ala.Crim.App.1985) (quoting Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970)). Appellate courts should `examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.' Beck v. State, 396 So.2d 645, 664 (Ala.1980). However, the sentences received by codefendants are not controlling per se, Hamm v. State, 564 So.2d 453, 464 (Ala.Crim.App.1989), and this Court has not required or directed that every person implicated in a crime receive the same punishment. Williams v. State, 461 So.2d 834, 849 (Ala.Crim.App.1983), rev'd on other grounds, 461 So.2d 852 (Ala.1984). '"There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant receives a lesser sentence."' Id. (quoting Collins v. State, 243 Ga. 291, 253 S.E.2d 729 (1979))."
Ex parte McWhorter, 781 So.2d 330, 344 (Ala.2000). "Because of `the need for individualized consideration as a constitutional requirement in imposing the death sentence', Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990 (1978), the focus must be on the defendant." Wright v. State, 494 So.2d 726, 740 (Ala.Crim.App.1985), aff'd, 494 So.2d 745 (Ala.1986). As discussed further in Part XVI of this opinion, Gavin's sentence is not disproportionate or excessive when compared to the sentences imposed in similar cases.

XVI.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Gavin's capital-murder convictions, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Gavin's sentence in accordance with  13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Gavin's capital-murder convictions, we shall also review the propriety of the death sentence. This review shall include our *995 determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Gavin of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with  13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by a vote of 10-2.
Thereafter, the trial court held another hearing, in accordance with  13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Gavin to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by  13A-5-47(b). In its sentencing order, the trial court entered specific written findings regarding the existence or nonexistence of each mitigating circumstance enumerated in  13A-5-51, Ala.Code 1975, as well as written findings of fact summarizing the offense and Gavin's participation in it. In addition, the court expressly stated that it had considered the mitigating evidence offered by Gavin pursuant  13A-5-52, Ala.Code 1975, and that it found no nonstatutory mitigating circumstances to exist.
The trial court also entered specific written findings concerning the three aggravating circumstances in  13A-5-49, Ala.Code 1975, that it found to exist, but it did not enter specific written findings as to the remainder of the aggravating circumstances in  13A-5-49, Ala.Code 1975, as required by  13A-5-47(d), Ala.Code 1975. However, in Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.1999), this Court held that a trial court's failure to make specific written findings regarding those aggravating circumstances in  13A-5-49, Ala.Code 1975, that it found not to exist was harmless. We stated:
"[T]he trial court did not `enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49' as required by  13A-5-47, Ala.Code 1975. Nevertheless, we find this omission to be harmless.
"`While the trial court's sentencing order is defective, the errors are not so egregious or substantial as to require a new sentencing order. "The sole purpose of requiring that the trial judge, as the sentencing authority, make a written finding of the aggravating circumstance is to provide for appellate review of the sentence of death." Ex parte Kyzer, 399 So.2d 330, 338 (Ala.1981). "[T]he harmless error rule does apply in capital cases at the sentence hearing." Ex parte *996 Whisenhant, 482 So.2d 1241, 1244 (Ala.1983). "As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are `so clear and convincing that virtually no reasonable person could differ,' a harmless error analysis can be used." Baldwin v. State, 456 So.2d 117, 126 (Ala.Cr.App.1983), affirmed, Ex parte Baldwin, 456 So.2d 129, 140 (Ala.1984). See also Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); Thompson v. State, 503 So.2d 871, 881 (Ala.Cr.App.1986), affirmed, Ex parte Thompson, 503 So.2d 887 (Ala.), cert. denied, Thompson v. Alabama, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). We emphasize that "the safer practice would have been for the trial judge to simply follow the verbiage of the statute in negating aggravating circumstances." Berard v. State, 402 So.2d 1044, 1051 (Ala.Cr.App.1980).'
"Fortenberry v. State, 545 So.2d 129, 144 (Ala.Cr.App.1988).
"There is nothing to indicate that the trial court refused or failed to consider any aggravating circumstances. Furthermore, this court has before it a sufficient basis for reviewing the appellant's death sentence. Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Fortenberry, supra; Kyzer, supra. Therefore, the appellant's argument is without merit."
730 So.2d at 1219.
Similarly, the record here indicates that the trial court did not refuse or fail to consider any applicable aggravating circumstances. At the sentencing hearing before the jury and the sentencing hearing before the court, the State argued the existence of only three aggravating circumstances, the same three that the trial court expressly found to exist. Moreover, given the court's express finding as to the existence of three aggravating circumstances, it is clear that the court found the remaining aggravating circumstances listed in  13A-5-49, Ala.Code 1975, not to exist and, thus, we have a sufficient basis to review the propriety of Gavin's death sentence. Therefore, we conclude that the defect in the court's sentencing order was a technical error without injury to Gavin.[33]
As noted, in its findings, the trial court found the existence of three statutory aggravating circumstances: (1) that the murder was committed while Gavin was under a sentence of imprisonment, see  13A-5-49(1), Ala.Code 1975; (2) that Gavin had *997 previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, see  13A-5-49(2), Ala.Code 1975; and (3) that the murder was committed during the course of a robbery in the first degree, see  13A-5-49(4), Ala.Code 1975. The trial court found no statutory or nonstatutory mitigating circumstances to exist under  13A-5-51 and -52, Ala.Code 1975.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the absence of any mitigating circumstances, the trial court found that the aggravating circumstances outweighed the nonexistent mitigating circumstances. Accordingly, the trial court sentenced Gavin to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the sentencing phase of the proceedings.[34]
Gavin was convicted of murder committed during the course of a robbery and murder after Gavin had been convicted of murder in the 20 years preceding the present murder. These offenses are defined by statute as capital offenses. See  13A-5-40(a)(2) and 13A-5-40(a)(13), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., cases dealing with murders committed during a robbery: Reeves v. State, 807 So.2d 18 (Ala.Crim.App.2000); Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001); Maxwell v. State, 828 So.2d 347 (Ala.Crim.App.2000); Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000); West v. State, 793 So.2d 870 (Ala.Crim.App.2000); Clemons v. State, 720 So.2d 961 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998); Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997); Henderson v. State, 583 So.2d 276 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991); and cases where the defendant had been convicted of murder in the preceding 20 years: Peraita v. State, [Ms. *998 CR-01-0289, May 30, 2003] ___ So.2d ___ (Ala.Crim.App.2003); Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001); Flowers v. State, 799 So.2d 966 (Ala.Crim.App.1999); Borden v. State, 769 So.2d 935 (Ala.Crim.App.1997), aff'd, 769 So.2d 950 (Ala.2000); Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997); Carroll v. State, 599 So.2d 1253 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993); Nelson v. State, 511 So.2d 225 (Ala.Crim.App.1986), aff'd, 511 So.2d 248 (Ala.1987); Hubbard v. State, 500 So.2d 1204 (Ala.Crim.App.), aff'd, 500 So.2d 1231 (Ala.1986).
After carefully reviewing the record of the guilt phase and of the sentencing phase of Gavin's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the absence of any statutory or nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the nonexistent mitigating circumstances, and we agree that death is the appropriate sentence in this case. Considering the crime committed, and Gavin, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Therefore, based on the foregoing, Gavin's convictions and sentences are affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
NOTES
[1] The parties agreed to extend the time for the trial court to rule on the motion for a new trial until September 1, 2000. See Rule 24.4, Ala.R.Crim.P. The trial court then held two hearings on the motion for a new trial ÔÇö on May 30, 2000, and on August 4, 2000. The trial court did not issue an order denying the motion for a new trial, and the motion was denied by operation of law on September 1, 2000.
[2] One Cherokee County case that Gavin included in his statistics involved a Caucasian defendant who Gavin claimed in his motion for a new trial was capital eligible, but who was not indicted capitally. However, Gavin conceded at the hearing on the motion for a new trial that this particular case was not, in fact, one eligible for treatment as a capital case.
[3] Gavin cites to caselaw relating to when a defendant is entitled to a jury instruction on a lesser-included offense to capital murder. That caselaw does not translate, as Gavin contends, into an affirmative duty on the part of grand juries to indict.
[4] For example, Gavin argues that David Mendenhall and Angela Mendenhall, who were each indicted for the felony murder of their infant daughter, should have been indicted for capital murder pursuant to  13A-5-40(a)(15), Ala.Code 1975. However, an investigator with the DeKalb County Sheriff's Department testified at the hearing on the motion for a new trial that "[t]here was not enough clear evidence in that case to prove intentional murder of the child" so as to warrant a capital-murder charge. (R. 1459.) Gavin also argues that Tammette Michelle Helms should have been indicted for the capital murder of her infant daughter pursuant to  13A-5-40(a)(15), Ala.Code 1975. However, it appears from the record that Helms was indicted in 1990, before the murder of a child under the age of 14 years was made a capital crime. See Act. No. 92-601, Ala. Acts 1992. Gavin also argues that John Allen Stephens, who was indicted for intentional murder, should have been indicted for capital murder pursuant to  13A-5-40(a)(18), Ala.Code 1975, because, he says, Stephens was inside a vehicle when he fired the shot that killed the victim. However, the evidence at the hearing on the motion for a new trial indicated that although Stephens was inside the vehicle when he fired the first shot, he fired the second shot after he got out of the vehicle, and it was the second shot that actually killed the victim. (R. 1493.)
[5] For example, Gavin argues that Mike Thompson, who was indicted for the intentional murder of George Ledwell, should have been indicted for capital murder pursuant to  13A-5-40(a)(1), Ala.Code 1975, because, he says, the murder occurred during the course of a kidnapping, and pursuant to  13A-5-40(a)(14), Ala.Code 1975, because, he says, Thompson killed the victim because the victim was an informant. The only evidence Gavin presented was the testimony from an investigator with the Fort Payne Police Department indicating that after Thompson beat and shot the victim, he ordered two accomplices to dispose of the body and that the victim was still alive when he was transported by the accomplices. The investigator also testified that Thompson believed the victim had informed on him about criminal activity. Gavin presented no other evidence as to the facts of this crime, such as length of time between the shooting and the moving of the victim. Based on this scant testimony regarding the crime, we are left to speculate as to whether the moving of the victim while the victim was still alive actually elevated the crime to capital murder; for all we know, the moving was merely an afterthought and, thus, the murder did not occur during a kidnapping. In addition, merely because the victim was an informant does not make him a witness under  13A-15-40(a)(14), Ala.Code 1975. Gavin presented no evidence indicating that the victim had testified or had been subpoenaed to testify as required by  13A-5-40(a)(14), Ala.Code 1975.
[6] Section 13-11-2(a)(13), Ala.Code 1975, made a murder capital if it was "committed by a defendant who has been convicted of murder in the first or second degree in the 20 years preceding the crime."
[7] See Part VII.C. of this opinion.
[8] Before trial, Gavin filed a motion for discovery of all "newspaper articles, audio and video recordings, transcripts, photographs, and all other relevant materials" from all news organizations that had reported about the crime. (C. 25.) At a hearing on that motion, he indicated that he was requesting such discovery because he planned to file a motion for a change of venue due to pretrial publicity, and he requested that the trial court defer ruling on the discovery motion until he had filed the motion for a change of venue. The record reflects, however, that Gavin never filed a motion for a change of venue.
[9] Ufford was unable to be present at the hearing. Before the hearing, he filed a written request to delay the hearing until he could be present. However, the trial court denied the motion, finding that Smith's presence was sufficient for purposes of the hearing.
[10] Gavin also moved to dismiss Count II of the indictment; that motion was denied.
[11] Gavin presented no evidence of the total population of Cherokee County; the only evidence he introduced was the number of African-Americans in Cherokee County. He merely argued, without evidentiary support, that 6.6% of the population of Cherokee County was African-American. However, it appears from the transcript of the hearing on the motion for a new trial that both the prosecutor and the trial court accepted this statistic as true despite the lack of evidence to support it; we will do the same.
[12] We note that even in his brief on appeal, Gavin does not identify what process Cherokee County uses to summon its jurors. He merely makes a broad and sweeping argument that all of "the traditional means for collecting names for jury selection" are unconstitutional. (Gavin's brief at p. 78.)
[13] We are not persuaded by Gavin's argument at the hearing on his motion for a new trial that there was a violation of the fair-cross-section requirement with respect to the petit-jury venire despite the over representation of African-Americans because the African-Americans who were on that venire were older and would be less favorable to him than younger African-Americans.
[14] This case does not fall within the Alabama Supreme Court's holdings in Ex parte Williams, 571 So.2d 987 (Ala.1990), and Ex parte Nguyen, 751 So.2d 1224 (Ala.1999), that the State waives any objection to the timeliness of a Batson motion by not objecting on that ground at trial. Unlike Ex parte Williams and Ex parte Nguyen, in this case, the trial court actually ruled that Gavin's Batson motion was untimely; therefore, there was no need for the State to object on this ground at trial.
[15] In his brief, Gavin argues that evidence of his burglary conviction was introduced during the guilt phase of his trial. However, the record reflects that the burglary conviction was introduced during the sentencing hearing before the court, not during the guilt phase of the trial.
[16] The last paragraph of the document was a recommendation regarding possible parole.
[17] We note that the record is not clear as to when Gavin actually received the document. The record reflects that Gavin was notified at a pretrial hearing on October 26, 1999, six days before the trial began, that the State was planning to introduce evidence at the sentencing phase of the trial regarding the facts and circumstances of his prior murder conviction. At that hearing, the trial court indicated that the State was to provide Gavin with that evidence that day. At the hearing before the sentencing phase began, the trial court indicated that the prosecutor had provided "a package of material" from Morris's parole file on the Saturday the verdicts were returned, two days before the sentencing phase of the trial began on Monday. (R. 1219.) The parole file contained the "Official Statement of Facts," but it is not clear from the record whether Gavin had received this document before the trial began as suggested during the pretrial hearing.
[18] Morris testified that the document was made by an assistant state attorney in the regular course of business and had been transmitted to the Illinois Department of Corrections at the time Gavin arrived in the Department of Corrections or within 60 days thereafter for placement in Gavin's file, and that the Illinois Department of Corrections kept the statement in its file in the regular course of business.
[19] Although it is not clear, it does not appear that any of the other three Justices who voted in Ex parte Dunaway disagreed with this particular aspect of the main opinion.
[20] Although, as noted above, only four Justices concurred in the main opinion in Ex parte Dunaway ÔÇö two Justices concurred in the judgment and concurred in part and dissented in part as to the rationale and one Justice concurred in part, concurred in the result in part, and dissented in part ÔÇö it appears that there was no disagreement as to the basic premise that hearsay statements must bear a minimal indicia of reliability before they are admissible over a confrontation-clause challenge.
[21] We also find that the document does not fall within any of the other exceptions to the hearsay rule in Rules 803 and 804, Ala.R.Evid.
[22] Before Investigator Smith's identification testimony, a hearing on Gavin's objection was held outside the jury's presence.
[23] We note that Gavin also contends that the trial court erred in allowing Twilley to identify him at trial. Gavin did not object to Twilley's identification, and his entire argument on appeal regarding Twilley's identification is: "Twilley's identification likewise fails to meet the parameters set out in the consensus of modern research for producing a reliable identification, and it was plain error under [Ala.R.App.P.] 45A to admit it, the lack of a specific objection notwithstanding." (Gavin's brief at p. 90.) We have reviewed the record and conclude that the trial court did not err in allowing Twilley to identify Gavin at trial.
[24] We also note that on the third day of testimony (the fifth day of trial), the State introduced into evidence a second photograph of the murder weapon, State's Exhibit 37. Gavin did not object to the admission of this photograph at trial, nor does he argue on appeal that the admission of this photograph was error. Nevertheless, after reviewing the record, we conclude that admission of this photograph was also proper.
[25] At one point in his brief, Gavin appears to argue that the toboggan cap was also inadmissible because, he says, it was not properly authenticated under Rule 901, Ala.R.Evid. However, he later concedes in his brief that the toboggan cap was, in fact, properly authenticated. After reviewing the record, we conclude that the toboggan cap was properly authenticated.
[26] Citing the above listed Alabama cases, the editors classify Alabama as a state following the majority rule.
[27] We note that Gavin's reliance on United States v. Rozen, 600 F.2d 494 (5th Cir.1979), is misplaced. The issue in Rozen was not the admissibility of dog-tracking evidence, but whether such evidence was sufficient, by itself, to sustain a conviction. The majority of jurisdictions hold that dog-tracking evidence is not alone sufficient to sustain a conviction ÔÇö that it must be corroborated by other evidence linking the defendant to the crime. See, e.g., Commonwealth v. Michaux, 360 Pa.Super. 452, 520 A.2d 1177 (1987), and the cases cited therein. We need not decide that issue here because the dog-tracking evidence in this case was corroborated by an abundance of other evidence, including eyewitness identifications, implicating Gavin in the crimes.
[28] Gavin also "note[d]" for the court that although he had been advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when he was arrested, he had never waived those rights. (R. 992.) However, he conceded that the statement was not made pursuant to any questioning.
[29] Although Gavin does not specifically state in his brief which of his three convictions he is challenging on the ground of insufficient evidence, his argument is directed at the evidence linking him to Clayton's murder, i.e., the capital-murder convictions. He does not mention or otherwise make any argument about his attempted-murder conviction. Nevertheless, we have reviewed the record and find that the evidence was more than sufficient to sustain Gavin's attempted-murder conviction.
[30] Although Gavin does not make the argument, we note that the jury was not instructed on the necessity of corroboration of accomplice testimony. However, "Alabama has applied the harmless error analysis in a case involving the death penalty to the failure of the court to instruct the jury on the principle of accomplice corroboration." Burton v. State, 651 So.2d 641, 654 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994). It is well settled that "the error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of the accomplice has in fact been corroborated." Gurley v. State, 639 So.2d 557, 561 (Ala.Crim.App.1993). See also Ziegler v. State, 886 So.2d 127 (Ala.Crim.App.2003); Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); and Hyde v. State, 778 So.2d 199 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). Because we conclude that Meeks's testimony was sufficiently corroborated, any error on the part of the trial court in not instructing the jury on the need for corroboration of accomplice testimony was harmless.
[31] We note that Gavin did raise this claim in his motion for a new trial. However, "`[g]enerally, improper argument of counsel is not a valid ground for a motion for a new trial or subject to review on appeal unless there is a timely and specific objection by counsel or a motion to exclude, and adverse ruling thereon by the trial court, or a refusal of the trial court to make a ruling, and an objection thereto.'" Steeley v. State, 622 So.2d 421, 423 (Ala.Crim.App.1992), quoting Trawick v. State, 431 So.2d 574, 578 (Ala.Crim.App.1983). This issue was not preserved by its inclusion in Gavin's motion for a new trial.
[32] Gavin, however, requests that we take judicial notice of a newspaper article that he claims was in the Huntsville Times about the investigation of Dr. Pustilnik. We decline to do so. See, e.g., Ex parte Ebbers, 871 So.2d 776, 794 (Ala.2003) ("we know of no legitimate basis for taking `judicial notice' of copies of news articles").
[33] We note that since this Court issued its opinion in Stewart, supra, this Court has, on several occasions, remanded cases with instructions for the trial court to correct the sentencing order to include specific findings of fact regarding those aggravating circumstances in  13A-5-49, Ala.Code 1975, that it had found not to exist. However, in those cases, there were additional defects in the sentencing order that required a remand other than the failure to include specific findings regarding the aggravating circumstances that did not exist. See, e.g., Ziegler v. State, 886 So.2d 127 (Ala.Crim.App.2003)(remanding case because the trial court failed to make specific findings of fact regarding the mitigating circumstances that it had found not to exist as well as the aggravating circumstances it had found not to exist); Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App.2002)(remanding case because the trial court's findings regarding certain mitigating circumstances were erroneous as well because the court had failed to make specific findings of fact regarding those aggravating circumstances it had found not to exist); Key v. State, 891 So.2d 353 (Ala.Crim.App.2002)(remanding case because the trial court failed to make specific findings of fact regarding the mitigating circumstances that it had found not to exist as well as the aggravating circumstance it had found not to exist); McNabb v. State, 887 So.2d 929 (Ala.Crim.App.2001)(same); and Clark v. State, [Ms. CR-99-1062, December 1, 2000] ___ So.2d ___ (Ala.Crim.App.2000)(remanding case for the trial court to enter specific written findings summarizing the crime and the defendant's participation in it, regarding the existence or nonexistence of each mitigating circumstance in  13A-5-51, Ala.Code 1975, as well as regarding the nonexistence of aggravating circumstances). None of these cases overrule the proposition set forth in Stewart that remand may not be necessary when the only defect in the sentencing order is the lack of specific findings regarding those aggravating circumstances that the court found not to exist. Under the circumstances in this case, as in Stewart, we conclude that the defect in the sentencing order is harmless.
[34] In light of the United States Supreme Court's opinion in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), as part of our plain-error review, we have searched the record to determine if any inference can be drawn that Gavin is mentally retarded. See Ex parte Perkins, 851 So.2d 453 (Ala.2002). We have found no indication in the record that Gavin is mentally retarded, even under the broadest definition of mental retardation. Therefore, the imposition of the death sentence in this case is not unconstitutional. We also note that we have found no plain error in the penalty-phase instructions under the Alabama Supreme Court's opinion in Ex parte Bryant, [Ms. 1990901, June 21, 2002] ___ So.2d ___ (Ala.2002). The instructions given in this case are materially identical to those approved by the Supreme Court in Ex parte Trawick, 698 So.2d 162 (Ala.1997), and approved by this Court in McNabb v. State, 887 So.2d 929, 988 (Ala.Crim.App.2001)(opinion on application for rehearing).